**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **IN THE MATTER OF THE EXTRADITION** | **)** | |
| **OF** | **)** | **Misc. No. 05-1609-CBS** |
| **BOGDANS HVALEJS** | **)** | |
| | **)** | |

**GOVERNMENT'S MOTION TO AMEND COMPLAINT AND SUPPLEMENT MEMORANDUM: LAW OF EXTRADITION**

The United States of America, by and through Assistant United States Attorney John T. McNeil, respectfully submits this motion to amend the Complaint (Doc. No. 2), and supplements its Memorandum: Law of Extradition (Doc. No. 8). Since the time the government submitted those pleadings, the Department of State has informed undersigned counsel that references made to the United Nations Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances (1988)(also known as the "Vienna Convention") were in error; references should have been made to the United Nations Single Convention on Narcotic Drugs, 1961, done at New York March 30, 1961 ("the 1961 Single Convention"), as amended by the 1972 United Nations Protocol Amending the Single Convention on Narcotic Drugs, done at Geneva March 25, 1972 ("the 1972 Protocol").

As set forth in the Complaint, the Republic of Latvia is seeking the extradition of Hvalejs for two instances of theft in violation of Article 175, part 3 of the Criminal Law of Latvia, and one instance of the illegal purchase and possession of narcotics (heroin) in violation of Article 253, part 1 of the Criminal Law of Latvia. The theft charges are extraditable under Extradition Treaty between the United States and Latvia as cited in the Complaint. However, while possession with intent to distribute heroin is extraditable under the Vienna Convention, the purchase and possession for personal use – the crime with which Hvalejs is charged – is not.

Instead, the purchase and possession of heroin is extraditable under Article 36 of the 1961 Single Convention, as amended by Article 14 of the 1972 Protocol. A declaration of an Attorney-Adviser in the Office of Legal Counsel for the Department of State outlining the applicability of the 1961 Single Convention and the 1972 Protocol is attached as Exhibit 1.

For the foregoing reasons, the government respectfully moves to amend the Complaint to substitute references to the 1961 Single Convention and the 1972 Protocol for all existing references to the Vienna Convention; those references appear in ¶1, ¶d, and ¶e of the Complaint. In addition, this memorandum supplements the government's Memorandum: Law of Extradition to substitute the 1961 Single Convention and the 1972 Protocol for the reference to the Vienna Convention at page 6.

Respectfully Submitted,

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

Date: October 26, 2005          By:    /s/ John T. McNeil

JOHN T. McNEIL
Assistant U.S. Attorney
(617) 748-3242



DISTRICT OF COLUMBIA, ss:


DECLARATION OF KENNETH R. PROPP


I, Kenneth R. Propp, declare and say as follows:

1.  I am an Attorney-Adviser in the Office of the Legal
Adviser for the Department of State, Washington, D.C.  This
office has responsibility for extradition requests, and I am
charged with the extradition case of Bogdans Hvalejs.  This
declaration supercedes my declarations dated February 26, 2004,
and January 14, 2005.

2.  In accordance with the provisions of the extradition
treaty in full force and effect between the United States and
Latvia, the Embassy of Latvia submitted a diplomatic note dated
January 27, 2004 formally requesting the extradition of
Bogdans Hvalejs.  A copy of the diplomatic note is attached to
this declaration.

3.  The relevant and applicable treaty provisions in full
force and effect between the United States and Latvia are found
in the Extradition Treaty between the United States of America
and Latvia of October 16, 1923, which entered into force on
March 1, 1924 (TS 677) and the Supplementary Treaty of
October 10, 1934, which entered into force on March 29, 1935
(TS 884).  Copies of the 1923 Treaty and the 1934 Supplementary
Treaty are attached to this declaration.

4.  The United States and Latvia also are parties to the
United Nations Single Convention on Narcotic Drugs, 1961, done

at New York March 30, 1961 ("the 1961 Single Convention"), as amended by the 1972 United Nations Protocol Amending the Single Convention on Narcotic Drugs, done at Geneva March 25, 1972 ("the 1972 Protocol"). A copy of the 1961 Single Convention and the 1972 Protocol are attached to this declaration. Article 36 of the 1961 Single Convention, as amended by Article 14 of the 1972 Protocol, provides that specified illicit narcotics activities shall be criminalized and shall be deemed to be included as extraditable offenses in any extradition treaty existing between the Parties. Purchase and possession of narcotics are among the offenses so specified.

5. In accordance with Article XII of the 1923 Extradition Treaty between the United States and Latvia, as amended by the 1934 Supplementary Treaty, the United States provides legal representation in the United States courts for Latvia in its extradition requests, and Latvia provides legal representation in its courts for extradition requests made by the United States.

6. The offenses for which extradition is requested are covered under Article II of the 1923 Extradition Treaty, as amended by the 1934 Supplementary Treaty, and under the 1961 Single Convention, as amended by the 1972 Protocol.

7. The documents submitted by the Government of Latvia in support of its extradition request were certified in accordance with Title 18, United States Code, Section 3190, on January 13, 2004, by Landon R. Taylor, Consul General of the United States of America in Latvia. Mr. Taylor, at the time of his

06000804-1

# United States of America

## DEPARTMENT OF STATE

***To all to whom these presents shall come, Greetings:***

I Certify That Kenneth R. Propp, whose name is subscribed to th[illegible] document hereunto annexed, was at the time of subscribing the sa[illegible] Attorney Adviser, Office of the Legal Adviser, Department of Sta[illegible] United States of America, and that full faith and credit are due [illegible] his acts as such.

In testimony whereof, I, Condoleezza Rice, Secretary of State, have hereunto caused the seal of the Department of State to be affixed and my name subscribed by the Assistant Authentication Officer, of the said Department, at the city of Washington, in the District of Columbia, this eleventh day of October, 2005.

Secretary of State

By

Assistant Authentication Officer,
Department of State

*Is[illegible] pursuant to C[illegible] State of S[illegible], 1789, 1 St[illegible] 69; 22 U[illegible] 57; 22USC 2[illegible] 5 USC 3[illegible] USE 1733 et.[illegible] 8 USC 1[illegible] RULE 44 Fed[illegible] Rules of C[illegible] Procedure.*

*Th[illegible] Certificate is not valid if it is removed or altered in any way whatsoever*

certification, was the principal consular officer of the United States in Riga, Latvia.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on October 11, 2005.

Kenneth R. Propp

Attachments:

1. Copy of note
2. Copy of Extradition Treaty and Supplementary Treaty
3. Copy of 1961 UN Single Convention
4. Copy of 1972 Protocol



EMBASSY OF LATVIA
4325 SEVENTEENTH STREET, N.W.
WASHINGTON, D.C. 20011

L/LEI
DEPARTMENT OF STATE
2004 FEB -5 P 2:02

January 27, 2004
No. 34-186-144

Office of International Affairs
Criminal Division
Department of Justice
1301 New York Ave.
Washington, DC

Re: extradition of B.Hvalejs

To Whom It May Concern:

The Embassy of the Republic of Latvia has the honor in accordance with the *Agreement on Extradition of Criminals between Latvia and the United States of America* sign on October 16, 1923, Article 11 , to forward the enclosed documents on extradition of **Bogdans Hvalejs,** born on July 23, 1983.

Please, inform the Embassy of Latvia of the decisions taken regarding the request.

Thank you in advance for your kind assistance. If you have any further questions, please, do not hesitate to contact me, phone (202) 726-8213.

Enclosed: the mentioned documents in sealed envelope.

Sincerely,

Uvis Blūms
First Secretary

95 IM-14733



# *Latvia*

## EXTRADITION

*Treaty signed at Riga October 16, 1923*
*Senate advice and consent to ratification January 7, 1924*
*Ratified by the President of the United States January 10, 1924*
*Ratified by Latvia February 8, 1924*
*Ratifications exchanged at Riga March 1, 1924*
*Entered into force March 1, 1924*
*Proclaimed by the President of the United States March 3, 1924*
*Supplemented by agreement of October 10, 1934* [1]

43 Stat. 1738; Treaty Series 677

The United States of America and Latvia desiring to promote the cause of justice, have resolved to conclude a treaty for the extradition of fugitives from justice between the two countries and have appointed for that purpose the following Plenipotentiaries:

The President of the United States of America: F. W. B. Coleman, Envoy Extraordinary and Minister Plenipotentiary of the United States at Riga; and

The President of the Republic of Latvia: Germain Albat, Minister Plenipotentiary, Secretary General for Foreign Affairs;

Who, after having communicated to each other their respective full powers, found to be in good and due form, have agreed upon and concluded the following articles:

### ARTICLE I

It is agreed that the Government of the United States and the Government of Latvia shall, upon requisition duly made as herein provided, deliver up to justice any person, who may be charged with, or may have been convicted of, any of the crimes specified in Article II of the present Treaty committed within the jurisdiction of one of the High Contracting Parties, and who shall

[1] TS 884, *post*, p. 554.

seek an asylum or shall be found within the territories of the other; provided that such surrender shall take place only upon such evidence of criminality, as according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial if the crime or offense had been there committed.

ARTICLE II

Persons shall be delivered up according to the provisions of the present Treaty, who shall have been charged with or convicted of any of the following crimes:

1. Murder, comprehending the crimes designated by the terms parricide, assassination, manslaughter when voluntary, poisoning or infanticide.

2. The attempt to commit murder.

3. Rape, abortion, carnal knowledge of children under the age of twelve years.

4. Abduction or detention of women or girls for immoral purposes.

5. Bigamy.

6. Arson.

7. Wilful and unlawful destruction or obstruction of railroads, which endangers human life.

8. Crimes committed at sea:

a) Piracy, as commonly known and defined by the law of nations, or by statute;

b) Wrongfully sinking or destroying a vessel at sea or attempting to do so;

c) Mutiny or conspiracy by two or more members of the crew or other persons on board of a vessel on the high seas, for the purpose of rebelling against the authority of the Captain or Commander of such vessel, or by fraud or violence taking possession of such vessel;

d) Assault on board ship upon the high seas with intent to do bodily harm.

9. Burglary, defined to be the act of breaking into and entering the house of another in the night time with intent to commit a felony therein.

10. The act of breaking into and entering the offices of the Government and public authorities, or the offices of banks, banking houses, savings banks, trust companies, insurance and other companies, or other buildings not dwellings with intent to commit a felony therein.

11. Robbery, defined to be the act of feloniously and forcibly taking from the person of another goods or money by violence or by putting him in fear.

12. Forgery or the utterance of forged papers.

13. The forgery or falsification of the official acts of the Government or public authority, including Courts of Justice, or the uttering or fraudulent use of any of the same.

14. The fabrication of counterfeit money, whether coin or paper, counterfeit titles or coupons of public debt, created by National, State, Provincial, Territorial, Local or Municipal Governments, bank notes or other instruments of public credit, counterfeit seals, stamps, dies and marks of State or public administrations, and the utterance, circulation or fraudulent use of the above mentioned objects.

15. Embezzlement or criminal malversation committed within the jurisdiction of one or the other party by public officers or depositaries, where the amount embezzled exceeds two hundred dollars or Latvian equivalent.

16. Embezzlement by any person or persons hired, salaried or employed, to the detriment of their employers or principals, when the crime or offense is punishable by imprisonment or other corporal punishment by the laws of both countries, and where the amount embezzled exceeds two hundred dollars or Latvian equivalent.

17. Kidnapping of minors or adults, defined to be the abduction or detention of a person or persons, in order to exact money from them, their families or any other person or persons, or for any other unlawful end.

18. Larceny, defined to be the theft of effects, personal property, or money, of the value of twenty-five dollars or more, or Latvian equivalent.

19. Obtaining money, valuable securities or other property by false pretenses or receiving any money, valuable securities or other property knowing the same to have been unlawfully obtained, where the amount of money or the value of the property so obtained or received exceeds two hundred dollars or Latvian equivalent.

20. Perjury or subornation of perjury.

21. Fraud or breach of trust by a bailee, banker, agent, factor, trustee, executor, administrator, guardian, director or officer of any company or corporation, or by any one in any fiduciary position, where the amount of money or the value of the property misappropriated exceeds two hundred dollars or Latvian equivalent.

22. Crimes and offenses against the laws of both countries for the suppression of slavery and slave trading.

23. Wilful desertion of minor or dependent children.

24. Extradition shall also take place for participation in any of the crimes before mentioned as an accessory before or after the fact; provided such participation be punishable by imprisonment by the laws of both the High Contracting Parties.[2]

ARTICLE III

The provisions of the present Treaty shall not import a claim of extradition for any crime or offense of a political character, nor for acts connected with such crimes or offenses; and no person surrendered by or to either of

[2] For an addition to list of crimes, see treaty of Oct. 10, 1934 (TS 884), *post*, p. 554.

the High Contracting Parties in virtue of this Treaty shall be tried or punished for a political crime or offense. When the offense charged comprises the act either of murder or assassination or of poisoning, either consummated or attempted, the fact that the offense was committed or attempted against the life of the Sovereign or Head of a foreign State or against the life of any member of his family, shall not be deemed sufficient to sustain that such crime or offense was of a political character; or was an act connected with crimes or offenses of a political character.

### Article IV

No person shall be tried for any crime or offense other than that for which he was surrendered.

### Article V

A fugitive criminal shall not be surrendered under the provisions hereof, when, from lapse of time or other lawful cause, according to the laws of the place within the jurisdiction of which the fugitive may be found, the criminal is exempt from prosecution or punishment for the offense for which the surrender is asked.

### Article VI

If a fugitive criminal whose surrender may be claimed pursuant to the stipulations hereof, be actually under prosecution, out on bail or in custody, for a crime or offense committed in the country where he has sought asylum, or shall have been convicted thereof, his extradition may be deferred until such proceedings be determined, and until he shall have been set at liberty in due course of law.

### Article VII

If a fugitive criminal claimed by one of the parties hereto, shall be also claimed by one or more powers pursuant to treaty provisions, on account of crimes committed within their jurisdiction, such criminal shall be delivered to that State whose demand is first received.

### Article VIII

Under the stipulations of this Treaty, neither of the High Contracting Parties shall be bound to deliver up its own citizens.

### Article IX

The expense of arrest, detention, examination and transportation of the accused shall be paid by the Government which has preferred the demand for extradition.

### ARTICLE X

Everything found in the possession of the fugitive criminal at the time of his arrest, whether being the proceeds of the crime or offense, or which may be material as evidence in making proof of the crime, shall so far as practicable, according to the laws of either of the High Contracting Parties, be delivered up with his person at the time of surrender. Nevertheless, the rights of a third party with regard to the articles referred to, shall be duly respected.

### ARTICLE XI

The stipulations of the present Treaty shall be applicable to all territory wherever situated, belonging to either of the High Contracting Parties or in the occupancy and under the control of either of them, during such occupancy or control.

Requisitions for the surrender of fugitives from justice shall be made by the respective diplomatic agents of the High Contracting Parties. In the event of the absence of such agents from the country or its seat of Government, or where extradition is sought from territory included in the preceding paragraphs, other than Latvia or the United States, requisitions may be made by superior consular officers. It shall be competent for such diplomatic or superior consular officers to ask and obtain a mandate or preliminary warrant of arrest for the person whose surrender is sought, whereupon the judges and magistrates of the two Governments shall respectively have power and authority, upon complaint made under oath, to issue a warrant for the apprehension of the person charged, in order that he or she may be brought before such judge or magistrate, that the evidence of criminality may be heard and considered and if, on such hearing, the evidence be deemed sufficient to sustain the charge, it shall be the duty of the examining judge or magistrate to certify it to the proper executive authority, that a warrant may issue for the surrender of the fugitive.

In case of urgency, the application for arrest and detention may be addressed directly to the competent magistrate in conformity to the statutes in force.

The person provisionally arrested shall be released, unless within two months from the date of arrest in Latvia, or from the date of commitment in the United States, the formal requisition for surrender with the documentary proofs hereinafter prescribed be made as aforesaid by the diplomatic agent of the demanding Government or, in his absence, by a consular officer thereof.

If the fugitive criminal shall have been convicted of the crime for which his surrender is asked, a copy of the sentence of the court before which such conviction took place, duly authenticated, shall be produced. If, however, the fugitive is merely charged with crime, a duly authenticated copy of the warrant of arrest in the country where the crime was committed, and of the depositions upon which such warrant may have been issued, shall be pro-

duced, with such other evidence or proof as may be deemed competent in the case.

ARTICLE XII

In every case of a request made by either of the High Contracting Parties for the arrest, detention or extradition of fugitive criminals, the appropriate legal officers of the country where the proceedings of extradition are had, shall assist the officers of the Government demanding the extradition before the respective judges and magistrates, by every legal means within their power; and no claim whatever for compensation for any of the services so rendered shall be made against the Government demanding the extradition; provided, however, that any officer or officers of the surrendering Government so giving assistance, who shall, in the usual course of their duty, receive no salary or compensation other than specific fees for services performed, shall be entitled to receive from the Government demanding the extradition the customary fees for the acts or services performed by them, in the same manner and to the same amount as though such acts or services had been performed in ordinary criminal proceedings under the laws of the country of which they are officers.

ARTICLE XIII

The present Treaty shall be ratified by the High Contracting Parties in accordance with their respective constitutional methods and shall take effect on the date of the exchange of ratifications which shall take place at Riga as soon as possible.

ARTICLE XIV

The present Treaty shall remain in force for a period of ten years, and in case neither of the High Contracting Parties shall have given notice one year before the expiration of that period of its intention to terminate the Treaty, it shall continue in force until the expiration of one year from the date on which such notice of termination shall be given by either of the High Contracting Parties.

In witness whereof the above-named Plenipotentiaries have signed the present Treaty and have hereunto affixed their seals.

Done in duplicate at Riga this sixteenth day of October, nineteen hundred and twenty-three.

F. W. B. COLEMAN [SEAL]
G. ALBAT [SEAL]

TREATY SERIES, No. 884

# EXTRADITION

## SUPPLEMENTARY TREATY BETWEEN THE UNITED STATES OF AMERICA AND LATVIA

Signed at Washington, October 10, 1934.
Ratification advised by the Senate of the United States, February 6, 1935.
Ratified by the President of the United States, February 14, 1935.
Ratified by Latvia, February 15, 1935.
Ratifications exchanged at Riga, March 29, 1935.
Proclaimed by the President of the United States, April 10, 1935.

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1935

For sale by the Superintendent of Documents, Washington, D. C. - - - - - Price 5 cents

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

## A PROCLAMATION

WHEREAS a Supplementary Extradition Treaty between the United States of America and the Republic of Latvia was concluded and signed by their respective Plenipotentiaries at Washington on the tenth day of October, one thousand nine hundred and thirty-four, the original of which Supplementary Treaty, being in the English language, is word for word as follows:

The United States of America and the Republic of Latvia, being desirous of enlarging the list of crimes on account of which extradition may be granted under the Treaty concluded between the two countries on October 16, 1923, with a view to the better administration of justice and the prevention of crime within their respective territories and jurisdictions, have resolved to conclude a supplementary treaty for this purpose and have appointed as their plenipotentiaries, to wit:

The President of the United States of America; Mr. Cordell Hull, Secretary of State of the United States of America; and

The President of the Republic of Latvia; Mr. Arturs Lule, Consul General of Latvia in New York,

Who, after having communicated to each other their respective full powers, which were found to be in due and proper form, have agreed to and concluded the following articles:

### ARTICLE I

The following crimes are added to the list of crimes numbered 1 to 24 in Article II of the said Treaty of October 16, 1923, on account of which extradition may be granted, that is to say:

25. Crimes against the bankruptcy laws.

### ARTICLE II

The present Treaty shall be considered as an integral part of the said Extradition Treaty of October 16, 1923, and Article II of the last mentioned Treaty shall be read as if the list of crimes therein contained had originally comprised the additional crime specified and numbered 25 in the first article of the present Treaty.

### ARTICLE III

The present Treaty shall be ratified by the High Contracting Parties in accordance with their respective constitutional methods, and shall take effect on the date of the exchange of ratifications, which shall take place at Riga as soon as possible.

IN WITNESS WHEREOF, the above named plenipotentiaries have signed the present Treaty and have hereunto affixed their seals.

DONE in duplicate at Washington, this tenth day of October, one thousand nine hundred and thirty-four.

CORDELL HULL [SEAL]
ARTURS LULE [SEAL]

AND WHEREAS, the said Supplementary Treaty has been duly ratified on both parts, and the ratifications of the two Governments were exchanged in the city of Riga on the twenty-ninth day of March, one thousand nine hundred and thirty-five;

NOW, THEREFORE, be it known that I, Franklin D. Roosevelt, President of the United States of America, have caused the said Supplementary Treaty to be made public, to the end that the same and every article and clause thereof may be observed and fulfilled with good faith by the United States of America and the citizens thereof.

IN TESTIMONY WHEREOF, I have hereunto set my hand and caused the Seal of the United States of America to be affixed.

DONE at the city of Washington this tenth day of April, in the year of our Lord one thousand nine hundred and thirty-five and of the Independence of the United States of America the one hundred and fifty-ninth.

[SEAL]

FRANKLIN D ROOSEVELT

By the President:
CORDELL HULL
*Secretary of State.*



# MULTILATERAL

## Single Convention on Narcotic Drugs, 1961

*Done at New York March 30, 1961;* [1]

*Accession advised by the Senate of the United States of America May 8, 1967;*

*Accession approved by the President of the United States of America May 15, 1967;*

*Accession of the United States of America deposited with the Secretary-General of the United Nations May 25, 1967;*

*Proclaimed by the President of the United States of America July 12, 1967;*

*Entered into force with respect to the United States of America June 24, 1967.*

---

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

### A PROCLAMATION

WHEREAS the Single Convention on Narcotic Drugs, 1961, was opened for signature at New York on March 30, 1961 to August 1, 1961, the text of which Convention in the English, French, Chinese, Russian, and Spanish languages is word for word as follows:

---

[1] Texts are as certified by the Secretary-General of the United Nations, New York.

[Footnote added by the Department of State.]

UNITED NATIONS CONFERENCE

FOR THE ADOPTION OF A SINGLE CONVENTION

ON NARCOTIC DRUGS

# SINGLE CONVENTION ON NARCOTIC DRUGS, 1961

*UNITED NATIONS*
*1961*

TIAS 6298

## SINGLE CONVENTION ON NARCOTIC DRUGS, 1961

### PREAMBLE

*The Parties,*

*Concerned* with the health and welfare of mankind,

*Recognizing* that the medical use of narcotic drugs continues to be indispensable for the relief of pain and suffering and that adequate provision must be made to ensure the availability of narcotic drugs for such purposes,

*Recognizing* that addiction to narcotic drugs constitutes a serious evil for the individual and is fraught with social and economic danger to mankind,

*Conscious* of their duty to prevent and combat this evil,

*Considering* that effective measures against abuse of narcotic drugs require co-ordinated and universal action,

*Understanding* that such universal action calls for international co-operation guided by the same principles and aimed at common objectives,

*Acknowledging* the competence of the United Nations in the field of narcotics control and desirous that the international organs concerned should be within the framework of that Organization,

*Desiring* to conclude a generally acceptable international convention replacing existing treaties on narcotic drugs, limiting such drugs to medical and scientific use, and providing for continuous international co-operation and control for the achievement of such aims and objectives,

*Hereby agree* as follows:

### ARTICLE 1

*Definitions*

1. Except where otherwise expressly indicated or where the context otherwise requires, the following definitions shall apply throughout the Convention:

(*a*) "Board" means the International Narcotics Control Board.

(*b*) "Cannabis" means the flowering or fruiting tops of the cannabis plant (excluding the seeds and leaves when not accompanied by the tops) from which the resin has not been extracted, by whatever name they may be designated.

(*c*) "Cannabis plant" means any plant of the genus cannabis.

(*d*) "Cannabis resin" means the separated resin, whether crude or purified, obtained from the cannabis plant.

(*e*) "Coca bush" means the plant of any species of the genus erythroxylon.

(*f*) "Coca leaf" means the leaf of the coca bush except a leaf from which all ecgonine, cocaine and any other ecgonine alkaloids have been removed.

(*g*) "Commission" means the Commission on Narcotic Drugs of the Council.

(*h*) "Council" means the Economic and Social Council of the United Nations.

(*i*) "Cultivation" means the cultivation of the opium poppy, coca bush or cannabis plant.

(*j*) "Drug" means any of the substances in Schedules I and II, whether natural or synthetic.

(*k*) "General Assembly" means the General Assembly of the United Nations.

(*l*) "Illicit traffic" means cultivation or trafficking in drugs contrary to the provisions of this Convention.

(*m*) "Import" and "export" mean in their respective connotations the physical transfer of drugs from one State to another State, or from one territory to another territory of the same State.

(*n*) "Manufacture" means all processes, other than production, by which drugs may be obtained and includes refining as well as the transformation of drugs into other drugs.

(*o*) "Medicinal opium" means opium which has undergone the processes necessary to adapt it for medicinal use.

(*p*) "Opium" means the coagulated juice of the opium poppy.

(*q*) "Opium poppy" means the plant of the species *Papaver somniferum L.*

(*r*) "Poppy straw" means all parts (except the seeds) of the opium poppy, after mowing.

(*s*) "Preparation" means a mixture, solid or liquid, containing a drug.

(*t*) "Production" means the separation of opium, coca leaves, cannabis and cannabis resin from the plants from which they are obtained.

(*u*) "Schedule I", "Schedule II", "Schedule III" and "Schedule IV" mean the correspondingly numbered list of drugs or preparations annexed to this Convention, as amended from time to time in accordance with article 3.

(*v*) "Secretary-General" means the Secretary-General of the United Nations.

(*w*) "Special stocks" means the amounts of drugs held in a country or territory by the government of such country or territory for special Government purposes and to meet exceptional circumstances; and the expression "special purposes" shall be construed accordingly.

(*x*) "Stocks" means the amounts of drugs held in a country or territory and intended for:

(i) Consumption in the country or territory for medical and scientific purposes,

(ii) Utilization in the country or territory for the manufacture of drugs and other substances, or

(iii) Export;

but does not include the amounts of drugs held in the country or territory

(iv) By retail pharmacists or other authorized retail distributors and by institutions or qualified persons in the duly authorized exercise of therapeutic or scientific functions, or

(v) As "special stocks".

(*y*) "Territory" means any part of a State which is treated as a separate entity for the application of the system of import certificates and export authorizations provided for in article 31. This definition shall not apply to the term "territory" as used in articles 42 and 46.

2. For the purposes of this Convention a drug shall be regarded as "consumed" when it has been supplied to any person or enterprise for retail distribution, medical use or scientific research; and "consumption" shall be construed accordingly.

ARTICLE 2

*Substances under control*

1. Except as to measures of control which are limited to specified drugs, the drugs in Schedule I are subject to all measures of control applicable to drugs under this Convention and in particular to those prescribed in articles 4 (*c*), 19, 20, 21, 29, 30, 31, 32, 33, 34 and 37.

2. The drugs in Schedule II are subject to

the same measures of control as drugs in Schedule I with the exception of the measures prescribed in article 30, paragraphs 2 and 5, in respect of the retail trade.

3. Preparations other than those in Schedule III are subject to the same measures of control as the drugs which they contain, but estimates (article 19) and statistics (article 20) distinct from those dealing with these drugs shall not be required in the case of such preparations, and article 29, paragraph 2 (*c*) and article 30, paragraph 1 (*b*) (ii) need not apply.

4. Preparations in Schedule III are subject to the same measures of control as preparations containing drugs in Schedule II except that article 31, paragraphs 1 (*b*) and 4 to 15 need not apply, and that for the purpose of estimates (article 19) and statistics (article 20) the information required shall be restricted to the quantities of drugs used in the manufacture of such preparations.

5. The drugs in Schedule IV shall also be included in Schedule I and subject to all measures of control applicable to drugs in the latter schedule, and in addition thereto:

(*a*) A Party shall adopt any special measures of control which in its opinion are necessary having regard to the particularly dangerous properties of a drug so included; and

(*b*) A Party shall, if in its opinion the prevailing conditions in its country render it the most appropriate means of protecting the public health and welfare, prohibit the production, manufacture, export and import of, trade in, possession or use of any such drug except for amounts which may be necessary for medical and scientific research only, including clinical trials therewith to be conducted under or subject to the direct supervision and control of the Party.

6. In addition to the measures of control applicable to all drugs in Schedule I, opium is subject to the provisions of articles 23 and 24, the coca leaf to those of articles 26 and 27 and cannabis to those of article 28.

7. The opium poppy, the coca bush, the cannabis plant, poppy straw and cannabis leaves are subject to the control measures prescribed in articles 22 to 24; 22, 26 and 27; 22 and 28; 25; and 28, respectively.

8. The Parties shall use their best endeavours to apply to substances which do not fall under this Convention, but which may be used in the illicit manufacture of drugs, such measures of supervision as may be practicable.

9. Parties are not required to apply the provisions of this Convention to drugs which are commonly used in industry for other than medical or scientific purposes, provided that:

(*a*) They ensure by appropriate methods of denaturing or by other means that the drugs so used are not liable to be abused or have ill effects (article 3, paragraph 3) and that the harmful substances cannot in practice be recovered; and

(*b*) They include in the statistical information (article 20) furnished by them the amount of each drug so used.

### Article 3

*Changes in the scope of control*

1. Where a Party or the World Health Organization has information which in its opinion may require an amendment to any of the Schedules, it shall notify the Secretary-General and furnish him with the information in support of the notification.

2. The Secretary-General shall transmit such notification, and any information which he considers relevant, to the Parties, to the Commission, and, where the notification is made by a Party, to the World Health Organization.

3. Where a notification relates to a substance not already in Schedule I or in Schedule II,

(i) The Parties shall examine in the light of the available information the possibility of the provisional application to the substance of all measures of control applicable to drugs in Schedule I;

(ii) Pending its decision as provided in sub-paragraph (iii) of this paragraph, the Commission may decide that the Parties apply provisionally to that substance all measures of control applicable to drugs in Schedule I. The Parties shall apply such measures provisionally to the substance in question;

(iii) If the World Health Organization finds that the substance is liable to similar abuse and productive of similar ill effects as the drugs in Schedule I or Schedule II or is convertible into a drug, it shall communicate that finding to the Commission which may, in accordance with the recommendation of the World Health Organization, decide that the substance shall be added to Schedule I or Schedule II.

4. If the World Health Organization finds that a preparation because of the substances which it contains is not liable to abuse and cannot produce ill effects (paragraph 3) and that the drug therein is not readily recoverable, the Commission may, in accordance with the recommendation of the World Health Organization, add that preparation to Schedule III.

5. If the World Health Organization finds that a drug in Schedule I is particularly liable to abuse and to produce ill effects (paragraph 3) and that such liability is not offset by substantial therapeutic advantages not possessed by substances other than drugs in Schedule IV, the Commission may, in accordance with the recommendation of the World Health Organization, place that drug in Schedule IV.

6. Where a notification relates to a drug already in Schedule I or Schedule II or to a preparation in Schedule III, the Commission, apart from the measure provided for in paragraph 5, may, in accordance with the recommendation of the World Health Organization, amend any of the Schedules by:

(*a*) Transferring a drug from Schedule I to Schedule II or from Schedule II to Schedule I; or

(*b*) Deleting a drug or a preparation as the case may be, from a Schedule.

7. Any decision of the Commission taken pursuant to this article shall be communicated by the Secretary-General to all States Members of the United Nations, to non-member States Parties to this Convention, to the World Health Organization and to the Board. Such decision shall become effective with respect to each Party on the date of its receipt of such communication, and the Parties shall thereupon take such action as may be required under this Convention.

8. (*a*) The decisions of the Commission amending any of the schedules shall be subject to review by the Council upon the request of any Party filed within ninety days from receipt of notification of the decision. The request for review shall be sent to the Secretary-General together with all relevant information upon which the request for review is based;

(*b*) The Secretary-General shall transmit copies of the request for review and relevant information to the Commission, the World Health Organization and to all the Parties inviting them to submit comments within ninety days. All comments received shall be submitted to the Council for consideration;

(*c*) The Council may confirm, alter or reverse the decision of the Commission, and the decision of the Council shall be final. Notification of the Council's decision shall be transmitted to all States Members of the United Nations, to non-member States Parties to this

Convention, to the Commission, to the World Health Organization, and to the Board.

(*d*) During pendency of the review the original decision of the Commission shall remain in effect.

9. Decisions of the Commission taken in accordance with this article shall not be subject to the review procedure provided for in article 7.

ARTICLE 4

*General obligations*

1. The Parties shall take such legislative and administrative measures as may be necessary:

(*a*) To give effect to and carry out the provisions of this Convention within their own territories;

(*b*) To co-operate with other States in the execution of the provisions of this Convention; and

(*c*) Subject to the provisions of this Convention, to limit exclusively to medical and scientific purposes the production, manufacture, export, import, distribution of, trade in, use and possession of drugs.

ARTICLE 5

*The international control organs*

The Parties, recognizing the competence of the United Nations with respect to the international control of drugs, agree to entrust to the Commission on Narcotic Drugs of the Economic and Social Council, and to the International Narcotics Control Board, the functions respectively assigned to them under this Convention.

ARTICLE 6

*Expenses of the international control organs*

The expenses of the Commission and the Board will be borne by the United Nations in such manner as shall be decided by the General Assembly. The Parties which are not members of the United Nations shall contribute to these expenses such amounts as the General Assembly finds equitable and assess from time to time after consultation with the Governments of these Parties.

ARTICLE 7

*Review of decisions and recommendations of the Commission*

Except for decisions under article 3, each decision or recommendation adopted by the Commission pursuant to the provisions of this Convention shall be subject to approval or modification by the Council or the General Assembly in the same way as other decisions or recommendations of the Commission.

ARTICLE 8

*Functions of the Commission*

The Commission is authorized to consider all matters pertaining to the aims of this Convention, and in particular:

(*a*) To amend the Schedules in accordance with article 3;

(*b*) To call the attention of the Board to any matters which may be relevant to the functions of the Board;

(*c*) To make recommendations for the implementation of the aims and provisions of this Convention, including programmes of scientific research and the exchange of information of a scientific or technical nature; and

(*d*) To draw the attention of non-parties to decisions and recommendations which it adopts under this Convention, with a view to their considering taking action in accordance therewith.

ARTICLE 9

*Composition of the Board*

1. The Board shall consist of eleven members to be elected by the Council as follows:

(*a*) Three members with medical, pharmacological or pharmaceutical experience from a list of at least five persons nominated by the World Health Organization; and

(*b*) Eight members from a list of persons nominated by the Members of the United Nations and by Parties which are not Members of the United Nations.

2. Members of the Board shall be persons who, by their competence, impartiality and disinterestedness, will command general confidence. During their term of office they shall not hold any position or engage in any activity which would be liable to impair their impartiality in the exercise of their functions. The Council shall, in consultation with the Board, make all arrangements necessary to ensure the full technical independence of the Board in carrying out its functions.

3. The Council, with due regard to the principle of equitable geographic representation, shall give consideration to the importance of including on the Board, in equitable proportion, persons possessing a knowledge of the drug situation in the producing, manufacturing, and consuming countries, and connected with such countries.

ARTICLE 10

*Terms of office and remuneration of members of the Board*

1. The members of the Board shall serve for a period of three years, and shall be eligible for re-election.

2. The term of office of each member of the Board shall end on the eve of the first meeting of the Board which his successor shall be entitled to attend.

3. A member of the Board who has failed to attend three consecutive sessions shall be deemed to have resigned.

4. The Council, on the recommendation of the Board, may dismiss a member of the Board who has ceased to fulfil the conditions required for membership by paragraph 2 of article 9. Such recommendation shall be made by an affirmative vote of eight members of the Board.

5. Where a vacancy occurs on the Board during the term of office of a member, the Council shall fill such vacancy as soon as possible and in accordance with the applicable provisions of article 9, by electing another member for the remainder of the term.

6. The members of the Board shall receive an adequate remuneration as determined by the General Assembly.

ARTICLE 11

*Rules of procedure of the Board*

1. The Board shall elect its own President and such other officers as it may consider necessary and shall adopt its rules of procedure.

2. The Board shall meet as often as, in its opinion, may be necessary for the proper discharge of its functions, but shall hold at least two sessions in each calendar year.

3. The quorum necessary at meetings of the Board shall consist of seven members.

ARTICLE 12

*Administration of the estimate system*

1. The Board shall fix the date or dates by which, and the manner in which, the estimates as provided in article 19 shall be furnished and shall prescribe the forms therefor.

Case 1:05-mj-01609-CBS Document 12-2 Filed 10/26/2005 Page 23 of 40

2. The Board shall, in respect of countries and territories to which this Convention does not apply, request the Governments concerned to furnish estimates in accordance with the provisions of this Convention.

3. If any State fails to furnish estimates in respect of any of its territories by the date specified, the Board shall, as far as possible, establish the estimates. The Board in establishing such estimates shall, to the extent practicable, do so in co-operation with the Government concerned.

4. The Board shall examine the estimates, including supplementary estimates, and, except as regards requirements for special purposes, may require such information as it considers necessary in respect of any country or territory on behalf of which an estimate has been furnished, in order to complete the estimate or to explain any statement contained therein.

5. The Board shall as expeditiously as possible confirm the estimates, including supplementary estimates, or, with the consent of the Government concerned, may amend such estimates.

6. In addition to the reports mentioned in article 15, the Board shall, at such times as it shall determine but at least annually, issue such information on the estimates as in its opinion will facilitate the carrying out of this Convention.

ARTICLE 13

*Administration of the statistical returns system*

1. The Board shall determine the manner and form in which statistical returns shall be furnished as provided in article 20 and shall prescribe the forms therefor.

2. The Board shall examine the returns with a view to determining whether a Party or any other State has complied with the provisions of this Convention.

3. The Board may require such further information as it considers necessary to complete or explain the information contained in such statistical returns.

4. It shall not be within the competence of the Board to question or express an opinion on statistical information respecting drugs required for special purposes.

ARTICLE 14

*Measures by the Board to ensure the execution of provisions of the Convention*

1. (*a*) If, on the basis of its examination of information submitted by Governments to the Board under the provisions of this Convention, or of information communicated by United Nations organs and bearing on questions arising under those provisions, the Board has reason to believe that the aims of this Convention are being seriously endangered by reason of the failure of any country or territory to carry out the provisions of this Convention, the Board shall have the right to ask for explanations from the Government of the country or territory in question. Subject to the right of the Board to call the attention of the Parties, the Council and the Commission to the matter referred to in sub-paragraph (*c*) below, it shall treat as confidential a request for information or an explanation by a Government under this sub-paragraph.

(*b*) After taking action under sub-paragraph (*a*) above, the Board, if satisfied that it is necessary to do so, may call upon the Government concerned to adopt such remedial measures as shall seem under the circumstances to be necessary for the execution of the provisions of this Convention.

(*c*) If the Board finds that the Government concerned has failed to give satisfactory ex-

planations when called upon to do so under sub-paragraph (a) above, or has failed to adopt any remedial measures which it has been called upon to take under sub-paragraph (b) above, it may call the attention of the Parties, the Council and the Commission to the matter.

2. The Board, when calling the attention of the Parties, the Council and the Commission to a matter in accordance with paragraph 1 (c) above, may, if it is satisfied that such a course is necessary, recommend to Parties that they stop the import of drugs, the export of drugs, or both, from or to the country or territory concerned, either for a designated period or until the Board shall be satisfied as to the situation in that country or territory. The State concerned may bring the matter before the Council.

3. The Board shall have the right to publish a report on any matter dealt with under the provisions of this article, and communicate it to the Council, which shall forward it to all Parties. If the Board publishes in this report a decision taken under this article or any information relating thereto, it shall also publish therein the views of the Government concerned if the latter so requests

4. If in any case a decision of the Board which is published under this article is not unanimous, the views of the minority shall be stated.

5. Any State shall be invited to be represented at a meeting of the Board at which a question directly interesting it is considered under this article.

6. Decisions of the Board under this article shall be taken by a two-thirds majority of the whole number of the Board.

### Article 15

*Reports of the Board*

1. The Board shall prepare an annual report on its work and such additional reports as it considers necessary containing also an analysis of the estimates and statistical information at its disposal, and, in appropriate cases, an account of the explanations, if any, given by or required of Governments, together with any observations and recommendations which the Board desires to make. These reports shall be submitted to the Council through the Commission, which may make such comments as it sees fit.

2. The reports shall be communicated to the Parties and subsequently published by the Secretary-General. The Parties shall permit their unrestricted distribution.

### Article 16

*Secretariat*

The secretariat services of the Commission and the Board shall be furnished by the Secretary-General.

### Article 17

*Special administration*

The Parties shall maintain a special administration for the purpose of applying the provisions of this Convention.

### Article 18

*Information to be furnished by Parties to the Secretary-General*

1. The Parties shall furnish to the Secretary-General such information as the Commission may request as being necessary for the performance of its functions, and in particular:

(a) An annual report on the working of the Convention within each of their territories;

(b) The text of all laws and regulations from time to time promulgated in order to give effect to this Convention;

(c) Such particulars as the Commission shall determine concerning cases of illicit traffic, including particulars of each case of illicit traffic discovered which may be of importance, because of the light thrown on the source from which drugs are obtained for the illicit traffic, or because of quantities involved or the method employed by illicit traffickers; and

(d) The names and addresses of the governmental authorities empowered to issue export and import authorizations or certificates.

2. Parties shall furnish the information referred to in the preceding paragraph in such manner and by such dates and use such forms as the Commission may request.

ARTICLE 19

*Estimates of drug requirements*

1. The Parties shall furnish to the Board each year for each of their territories, in the manner and form prescribed by the Board, estimates on forms supplied by it in respect of the following matters:

(a) Quantities of drugs to be consumed for medical and scientific purposes;

(b) Quantities of drugs to be utilized for the manufacture of other drugs, of preparations in Schedule III, and of substances not covered by this Convention;

(c) Stocks of drugs to be held as at 31 December of the year to which the estimates relate; and

(d) Quantities of drugs necessary for addition to special stocks.

2. Subject to the deductions referred to in paragraph 3 of article 21, the total of the estimates for each territory and each drug shall consist of the sum of the amounts specified under sub-paragraphs (a), (b) and (d) of paragraph 1 of this article, with the addition of any amount required to bring the actual stocks on hand at 31 December of the preceding year to the level estimated as provided in sub-paragraph (c) of paragraph 1.

3. Any State may during the year furnish supplementary estimates with an explanation of the circumstances necessitating such estimates.

4. The Parties shall inform the Board of the method used for determining quantities shown in the estimates and of any changes in the said method.

5. Subject to the deductions referred to in paragraph 3 of article 21, the estimates shall not be exceeded.

ARTICLE 20

*Statistical returns to be furnished to the Board*

1. The Parties shall furnish to the Board for each of their territories, in the manner and form prescribed by the Board, statistical returns on forms supplied by it in respect of the following matters:

(a) Production or manufacture of drugs;

(b) Utilization of drugs for the manufacture of other drugs, of preparations in Schedule III and of substances not covered by this Convention, and utilization of poppy straw for the manufacture of drugs;

(c) Consumption of drugs;

(d) Imports and exports of drugs and poppy straw;

(e) Seizures of drugs and disposal thereof; and

(f) Stocks of drugs as at 31 December of the year to which the returns relate.

2. (a) The statistical returns in respect of the matters referred to in paragraph 1, except sub-paragraph (d), shall be prepared annually and shall be furnished to the Board not later

89-984 O-68—15

than 30 June following the year to which they relate.

(*b*) The statistical returns in respect to the matters referred to in sub-paragraph (*d*) of paragraph 1 shall be prepared quarterly and shall be furnished to the Board within one month after the end of the quarter to which they relate.

3. In addition to the matters referred to in paragraph 1 of this article the Parties may as far as possible also furnish to the Board for each of their territories information in respect of areas (in hectares) cultivated for the production of opium.

4. The Parties are not required to furnish statistical returns respecting special stocks, but shall furnish separately returns respecting drugs imported into or procured within the country or territory for special purposes, as well as quantities of drugs withdrawn from special stocks to meet the requirements of the civilian population.

ARTICLE 21

*Limitation of manufacture and importation*

1. The total of the quantities of each drug manufactured and imported by any country or territory in any one year shall not exceed the sum of the following:

(*a*) The quantity consumed, within the limit of the relevant estimate, for medical and scientific purposes;

(*b*) The quantity used, within the limit of the relevant estimate, for the manufacture of other drugs, of preparations in Schedule III, and of substances not covered by this Convention;

(*c*) The quantity exported;

(*d*) The quantity added to the stock for the purpose of bringing that stock up to the level specified in the relevant estimate; and

(*e*) The quantity acquired within the limit of the relevant estimate for special purposes.

2. From the sum of the quantities specified in paragraph 1 there shall be deducted any quantity that has been seized and released for licit use, as well as any quantity taken from special stocks for the requirements of the civilian population.

3. If the Board finds that the quantity manufactured and imported in any one year exceeds the sum of the quantities specified in paragraph 1, less any deductions required under paragraph 2 of this article, any excess so established and remaining at the end of the year shall, in the following year, be deducted from the quantity to be manufactured or imported and from the total of the estimates as defined in paragraph 2 of article 19.

4. (*a*) If it appears from the statistical returns on imports or exports (article 20) that the quantity exported to any country or territory exceeds the total of the estimates for that country or territory, as defined in paragraph 2 of article 19, with the addition of the amounts shown to have been exported, and after deduction of any excess as established in paragraph 3 of this article, the Board may notify this fact to States which, in the opinion of the Board, should be so informed;

(*b*) On receipt of such a notification, Parties shall not during the year in question authorize any further exports of the drug concerned to that country or territory, except:

(i) In the event of a supplementary estimate being furnished for that country or territory in respect both of any quantity over-imported and of the additional quantity required, or

(ii) In exceptional cases where the export, in the opinion of the government of the exporting country, is essential for the treatment of the sick.

ARTICLE 22

*Special provision applicable to cultivation*

Whenever the prevailing conditions in the country or a territory of a Party render the prohibition of the cultivation of the opium poppy, the coca bush or the cannabis plant the most suitable measure, in its opinion, for protecting the public health and welfare and preventing the diversion of drugs into the illicit traffic, the Party concerned shall prohibit cultivation.

ARTICLE 23

*National opium agencies*

1. A Party that permits the cultivation of the opium poppy for the production of opium shall establish, if it has not already done so, and maintain, one or more government agencies (hereafter in this article referred to as the Agency) to carry out the functions required under this article.

2. Each such Party shall apply the following provisions to the cultivation of the opium poppy for the production of opium and to opium:

(*a*) The Agency shall designate the areas in which, and the plots of land on which, cultivation of the opium poppy for the purpose of producing opium shall be permitted.

(*b*) Only cultivators licensed by the Agency shall be authorized to engage in such cultivation.

(*c*) Each licence shall specify the extent of the land on which the cultivation is permitted.

(*d*) All cultivators of the opium poppy shall be required to deliver their total crops of opium to the Agency. The Agency shall purchase and take physical possession of such crops as soon as possible, but not later than four months after the end of the harvest.

(*e*) The Agency shall, in respect of opium, have the exclusive right of importing, exporting, wholesale trading and maintaining stocks other than those held by manufacturers of opium alkaloids, medicinal opium or opium preparations. Parties need not extend this exclusive right to medicinal opium and opium preparations.

3. The governmental functions referred to in paragraph 2 shall be discharged by a single government agency if the constitution of the Party concerned permits it.

ARTICLE 24

*Limitation on production of opium for international trade*

1. (*a*) If any Party intends to initiate the production of opium or to increase existing production, it shall take account of the prevailing world need for opium in accordance with the estimates thereof published by the Board so that the production of opium by such Party does not result in over-production of opium in the world.

(*b*) A Party shall not permit the production of opium or increase the existing production thereof if in its opinion such production or increased production in its territory may result in illicit traffic in opium.

2. (*a*) Subject to paragraph 1, where a Party which as of 1 January 1961 was not producing opium for export desires to export opium which it produces, in amounts not exceeding five tons annually, it shall notify the Board, furnishing with such notification information regarding:

(i) The controls in force as required by this Convention respecting the opium to be produced and exported; and

(ii) The name of the country or countries to which it expects to export such opium;

and the Board may either approve such notifi-

cation or may recommend to the Party that it not engage in the production of opium for export.

(*b*) Where a Party other than a Party referred to in paragraph 3 desires to produce opium for export in amounts exceeding five tons annually, it shall notify the Council, furnishing with such notification relevant information including:

(i) The estimated amounts to be produced for export;

(ii) The controls existing or proposed respecting the opium to be produced;

(iii) The name of the country or countries to which it expects to export such opium;

and the Council shall either approve the notification or may recommend to the Party that it not engage in the production of opium for export.

3. Notwithstanding the provisions of sub-paragraphs (*a*) and (*b*) of paragraph 2, a Party that during ten years immediately prior to 1 January 1961 exported opium which such country produced may continue to export opium which it produces.

4. (*a*) A Party shall not import opium from any country or territory except opium produced in the territory of:

(i) A Party referred to in paragraph 3;

(ii) A Party that has notified the Board as provided in sub-paragraph (*a*) of paragraph 2; or

(iii) A Party that has received the approval of the Council as provided in sub-paragraph (*b*) of paragraph 2.

(*b*) Notwithstanding sub-paragraph (*a*) of this paragraph, a Party may import opium produced by any country which produced and exported opium during the ten years prior to 1 January 1961 if such country has established and maintains a national control organ or agency for the purposes set out in article 23 and has in force an effective means of ensuring that the opium it produces is not diverted into the illicit traffic.

5. The provisions of this article do not prevent a Party:

(*a*) From producing opium sufficient for its own requirements; or

(*b*) From exporting opium seized in the illicit traffic, to another Party in accordance with the requirements of this Convention.

### Article 25

*Control of poppy straw*

1. A Party that permits the cultivation of the opium poppy for purposes other than the production of opium shall take all measures necessary to ensure:

(*a*) That opium is not produced from such opium poppies; and

(*b*) That the manufacture of drugs from poppy straw is adequately controlled.

2. The Parties shall apply to poppy straw the system of import certificates and export authorizations as provided in article 31, paragraphs 4 to 15.

3. The Parties shall furnish statistical information on the import and export of poppy straw as required for drugs under article 20, paragraphs 1 (*d*) and 2 (*b*).

### Article 26

*The coca bush and coca leaves*

1. If a Party permits the cultivation of the coca bush, it shall apply thereto and to coca leaves the system of controls as provided in article 23 respecting the control of the opium poppy, but as regards paragraph 2 (*d*) of that article, the requirements imposed on the

Agency therein referred to shall be only to take physical possession of the crops as soon as possible after the end of the harvest.

2. The Parties shall so far as possible enforce the uprooting of all coca bushes which grow wild. They shall destroy the coca bushes if illegally cultivated.

ARTICLE 27

*Additional provisions relating to coca leaves*

1. The Parties may permit the use of coca leaves for the preparation of a flavouring agent, which shall not contain any alkaloids, and, to the extent necessary for such use, may permit the production, import, export, trade in and possession of such leaves.

2. The Parties shall furnish separately estimates (article 19) and statistical information (article 20) in respect of coca leaves for preparation of the flavouring agent, except to the extent that the same coca leaves are used for the extraction of alkaloids and the flavouring agent, and so explained in the estimates and statistical information.

ARTICLE 28

*Control of cannabis*

1. If a Party permits the cultivation of the cannabis plant for the production of cannabis or cannabis resin, it shall apply thereto the system of controls as provided in article 23 respecting the control of the opium poppy.

2. This Convention shall not apply to the cultivation of the cannabis plant exclusively for industrial purposes (fibre and seed) or horticultural purposes.

3. The Parties shall adopt such measures as may be necessary to prevent the misuse of, and illicit traffic in, the leaves of the cannabis plant.

ARTICLE 29

*Manufacture*

1. The Parties shall require that the manufacture of drugs be under licence except where such manufacture is carried out by a State enterprise or State enterprises.

2. The Parties shall:

(*a*) Control all persons and enterprises carrying on or engaged in the manufacture of drugs;

(*b*) Control under licence the establishments and premises in which such manufacture may take place; and

(*c*) Require that licensed manufacturers of drugs obtain periodical permits specifying the kinds and amounts of drugs which they shall be entitled to manufacture. A periodical permit, however, need not be required for preparations.

3. The Parties shall prevent the accumulation, in the possession of drug manufacturers, of quantities of drugs and poppy straw in excess of those required for the normal conduct of business, having regard to the prevailing market conditions.

ARTICLE 30

*Trade and distribution*

1. (*a*) The Parties shall require that the trade in and distribution of drugs be under licence except where such trade or distribution is carried out by a State enterprise or State enterprises.

(*b*) The Parties shall:

(i) Control all persons and enterprises carrying on or engaged in the trade in or distribution of drugs;

(ii) Control under licence the establishments and premises in which such trade or dis-

tribution may take place. The requirement of licensing need not apply to preparations.

(c) The provisions of sub-paragraphs (a) and (b) relating to licensing need not apply to persons duly authorized to perform and while performing therapeutic or scientific functions.

2. The Parties shall also:

(a) Prevent the accumulation in the possession of traders, distributors, State enterprises or duly authorized persons referred to above, of quantities of drugs and poppy straw in excess of those required for the normal conduct of business, having regard to the prevailing market conditions; and

(b) (i) Require medical prescriptions for the supply or dispensation of drugs to individuals. This requirement need not apply to such drugs as individuals may lawfully obtain, use, dispense or administer in connexion with their duly authorized therapeutic functions; and

(ii) If the Parties deem these measures necessary or desirable, require that prescriptions for drugs in Schedule I should be written on official forms to be issued in the form of counterfoil books by the competent governmental authorities or by authorized professional associations.

3. It is desirable that Parties require that written or printed offers of drugs, advertisements of every kind or descriptive literature relating to drugs and used for commercial purposes, interior wrappings of packages containing drugs, and labels under which drugs are offered for sale indicate the international non-proprietary name communicated by the World Health Organization.

4. If a Party considers such measure necessary or desirable, it shall require that the inner package containing a drug or wrapping thereof shall bear a clearly visible double red band. The exterior wrapping of the package in which such drug is contained shall not bear a double red band.

5. A Party shall require that the label under which a drug is offered for sale show the exact drug content by weight or percentage. This requirement of label information need not apply to a drug dispensed to an individual on medical prescription.

6. The provisions of paragraphs 2 and 5 need not apply to the retail trade in or retail distribution of drugs in Schedule II.

## ARTICLE 31

### *Special provisions relating to international trade*

1. The Parties shall not knowingly permit the export of drugs to any country or territory except:

(a) In accordance with the laws and regulations of that country or territory; and

(b) Within the limits of the total of the estimates for that country or territory, as defined in paragraph 2 of article 19, with the addition of the amounts intended to be re-exported.

2. The Parties shall exercise in free ports and zones the same supervision and control as in other parts of their territories, provided, however, that they may apply more drastic measures.

3. The Parties shall:

(a) Control under licence the import and export of drugs except where such import or export is carried out by a State enterprise or enterprises;

(b) Control all persons and enterprises carrying on or engaged in such import or export.

4. (*a*) Every Party permitting the import or export of drugs shall require a separate import or export authorization to be obtained for each such import or export whether it consists of one or more drugs.

(*b*) Such authorization shall state the name of the drug, the international non-proprietary name if any, the quantity to be imported or exported, and the name and address of the importer and exporter, and shall specify the period within which the importation or exportation must be effected.

(*c*) The export authorization shall also state the number and date of the import certificate (paragraph 5) and the authority by whom it has been issued.

(*d*) The import authorization may allow an importation in more than one consignment.

5. Before issuing an export authorization the Parties shall require an import certificate, issued by the competent authorities of the importing country or territory and certifying that the importation of the drug or drugs referred to therein, is approved and such certificate shall be produced by the person or establishment applying for the export authorization. The Parties shall follow as closely as may be practicable the form of import certificate approved by the Commission.

6. A copy of the export authorization shall accompany each consignment, and the Government issuing the export authorization shall send a copy to the Government of the importing country or territory.

7. (*a*) The Government of the importing country or territory, when the importation has been effected or when the period fixed for the importation has expired, shall return the export authorization, with an endorsement to that effect, to the Government of the exporting country or territory.

(*b*) The endorsement shall specify the amount actually imported.

(*c*) If a lesser quantity than that specified in the export authorization is actually exported, the quantity actually exported shall be stated by the competent authorities on the export authorization and on any official copy thereof.

8. Exports of consignments to a post office box, or to a bank to the account of a party other than the party named in the export authorization, shall be prohibited.

9. Exports of consignments to a bonded warehouse are prohibited unless the government of the importing country certifies on the import certificate, produced by the person or establishment applying for the export authorization, that it has approved the importation for the purpose of being placed in a bonded warehouse. In such case the export authorization shall specify that the consignment is exported for such purpose. Each withdrawal from the bonded warehouse shall require a permit from the authorities having jurisdiction over the warehouse and, in the case of a foreign destination shall be treated as if it were a new export within the meaning of this Convention.

10. Consignments of drugs entering or leaving the territory of a Party not accompanied by an export authorization shall be detained by the competent authorities.

11. A Party shall not permit any drugs consigned to another country to pass through its territory, whether or not the consignment is removed from the conveyance in which it is carried, unless a copy of the export authorization for such consignment is produced to the competent authorities of such Party.

12. The competent authorities of any country or territory through which a consignment of drugs is permitted to pass shall take all due measures to prevent the diversion of the consignment to a destination other than that named

in the accompanying copy of the export authorization unless the Government of that country or territory through which the consignment is passing authorizes the diversion. The Government of the country or territory of transit shall treat any requested diversion as if the diversion were an export from the country or territory of transit to the country or territory of new destination. If the diversion is authorized, the provisions of paragraph 7 (*a*) and (*b*) shall also apply between the country or territory of transit and the country or territory which originally exported the consignment.

13. No consignment of drugs while in transit, or whilst being stored in a bonded warehouse, may be subjected to any process which would change the nature of the drugs in question. The packing may not be altered without the permission of the competent authorities.

14. The provisions of paragraphs 11 to 13 relating to the passage of drugs through the territory of a Party do not apply where the consignment in question is transported by aircraft which does not land in the country or territory of transit. If the aircraft lands in any such country or territory, those provisions shall be applied so far as circumstances require.

15. The provisions of this article are without prejudice to the provisions of any international agreements which limit the control which may be exercised by any of the Parties over drugs in transit.

16. Nothing in this article other than paragraphs 1 (*a*) and 2 need apply in the case of preparations in Schedule III.

ARTICLE 32

*Special provisions concerning the carriage of drugs in first-aid kits of ships or aircraft engaged in international traffic*

1. The international carriage by ships or aircraft of such limited amounts of drugs as may be needed during their journey or voyage for first-aid purposes or emergency cases shall not be considered to be import, export or passage through a country within the meaning of this Convention.

2. Appropriate safeguards shall be taken by the country of registry to prevent the improper use of the drugs referred to in paragraph 1 or their diversion for illicit purposes. The Commission, in consultation with the appropriate international organizations, shall recommend such safeguards.

3. Drugs carried by ships or aircraft in accordance with paragraph 1 shall be subject to the laws, regulations, permits and licences of the country of registry, without prejudice to any rights of the competent local authorities to carry out checks, inspections and other control measures on board ships or aircraft. The administration of such drugs in the case of emergency shall not be considered a violation of the requirements of article 30, paragraph 2 (*b*).

ARTICLE 33

*Possession of drugs*

The Parties shall not permit the possession of drugs except under legal authority.

ARTICLE 34

*Measures of supervision and inspection*

The Parties shall require:

(*a*) That all persons who obtain licences as provided in accordance with this Convention, or who have managerial or supervisory positions in a State enterprise established in accordance with this Convention, shall have adequate qualifications for the effective and faithful execution of the provisions of such laws and regulations as are enacted in pursuance thereof; and

(*b*) That governmental authorities, manufacturers, traders, scientists, scientific institutions and hospitals keep such records as will show the quantities of each drug manufactured and of each individual acquisition and disposal of drugs. Such records shall respectively be preserved for a period of not less than two years. Where counterfoil books (article 30, paragraph 2 (*b*)) of official prescriptions are used, such books including the counterfoils shall also be kept for a period of not less than two years.

### Article 35

*Action against the illicit traffic*

Having due regard to their constitutional, legal and administrative systems, the Parties shall:

(*a*) Make arrangements at the national level for co-ordination of preventive and repressive action against the illicit traffic; to this end they may usefully designate an appropriate agency responsible for such co-ordination;

(*b*) Assist each other in the campaign against the illicit traffic in narcotic drugs;

(*c*) Co-operate closely with each other and with the competent international organizations of which they are members with a view to maintaining a co-ordinated campaign against the illicit traffic;

(*d*) Ensure that international co-operation between the appropriate agencies be conducted in an expeditious manner; and

(*e*) Ensure that where legal papers are transmitted internationally for the purposes of a prosecution, the transmittal be effected in an expeditious manner to the bodies designated by the Parties; this requirement shall be without prejudice to the right of a Party to require that legal papers be sent to it through the diplomatic channel.

### Article 36

*Penal provisions*

1. Subject to its constitutional limitations, each Party shall adopt such measures as will ensure that cultivation, production, manufacture, extraction, preparation, possession, offering, offering for sale, distribution, purchase, sale, delivery on any terms whatsoever, brokerage, dispatch, dispatch in transit, transport, importation and exportation of drugs contrary to the provisions of this Convention, and any other action which in the opinion of such Party may be contrary to the provisions of this Convention, shall be punishable offences when committed intentionally, and that serious offences shall be liable to adequate punishment particularly by imprisonment or other penalties of deprivation of liberty.

2. Subject to the constitutional limitations of a Party, its legal system and domestic law,

(*a*) (i) Each of the offences enumerated in paragraph 1, if committed in different countries, shall be considered as a distinct offence;

(ii) Intentional participation in, conspiracy to commit and attempts to commit, any of such offences, and preparatory acts and financial operations in connexion with the offences referred to in this article, shall be punishable offences as provided in paragraph 1;

(iii) Foreign convictions for such offences shall be taken into account for the purpose of establishing recidivism; and

(iv) Serious offences heretofore referred to committed either by nationals or by foreigners shall be prosecuted by the Party in whose territory the offence was committed, or by the Party in whose territory the offender is found if extradition is not acceptable in conformity with the law of the Party to which application is made, and if such offender has not already been prosecuted and judgement given.

(b) It is desirable that the offences referred to in paragraph 1 and paragraph 2 (a) (ii) be included as extradition crimes in any extradition treaty which has been or may hereafter be concluded between any of the Parties, and, as between any of the Parties which do not make extradition conditional on the existence of a treaty or on reciprocity, be recognized as extradition crimes; provided that extradition shall be granted in conformity with the law of the Party to which application is made, and that the Party shall have the right to refuse to effect the arrest or grant the extradition in cases where the competent authorities consider that the offence is not sufficiently serious.

3. The provisions of this article shall be subject to the provisions of the criminal law of the Party concerned on questions of jurisdiction.

4. Nothing contained in this article shall affect the principle that the offences to which it refers shall be defined, prosecuted and punished in conformity with the domestic law of a Party.

### Article 37

*Seizure and confiscation*

Any drugs, substances and equipment used in or intended for the commission of any of the offences, referred to in article 36, shall be liable to seizure and confiscation.

### Article 38

*Treatment of drug addicts*

1. The Parties shall give special attention to the provision of facilities for the medical treatment, care and rehabilitation of drug addicts.

2. If a Party has a serious problem of drug addiction and its economic resources permit, it is desirable that it establish adequate facilities for the effective treatment of drug addicts.

### Article 39

*Application of stricter national control measures than those required by this Convention*

Notwithstanding anything contained in this Convention, a Party shall not be, or be deemed to be, precluded from adopting measures of control more strict or severe than those provided by this Convention and in particular from requiring that preparations in Schedule III or drugs in Schedule II be subject to all or such of the measures of control applicable to drugs in Schedule I as in its opinion is necessary or desirable for the protection of the public health or welfare.

### Article 40

*Languages of the Convention and procedure for signature, ratification and accession*

1. This Convention, of which the Chinese, English, French, Russian and Spanish texts are equally authentic, shall be open for signature until 1 August 1961 on behalf of any Member of the United Nations, of any non-member State which is a Party to the Statute of the International Court of Justice or member of a specialized agency of the United Nations, and also of any other State which the Council may invite to become a Party.

2. This Convention is subject to ratification. The instruments of ratification shall be deposited with the Secretary-General.

3. This Convention shall be open after 1 August 1961 for accession by the States referred to in paragraph 1. The instruments of accession shall be deposited with the Secretary-General.

### Article 41

*Entry into force*

1. This Convention shall come into force on the thirtieth day following the date on which

Case 1:05-mj-01669-CBS Document 12-2 Filed 10/26/2005 Page 38 of 40

the fortieth instrument of ratification or accession is deposited in accordance with article 40.

2. In respect of any other State depositing an instrument of ratification or accession after the date of deposit of the said fortieth instrument, this Convention shall come into force on the thirtieth day after the deposit by that State of its instrument of ratification or accession.

ARTICLE 42

*Territorial application*

This Convention shall apply to all non-metropolitan territories for the international relations of which any Party is responsible, except where the previous consent of such a territory is required by the Constitution of the Party or of the territory concerned, or required by custom. In such case the Party shall endeavour to secure the needed consent of the territory within the shortest period possible, and when that consent is obtained the Party shall notify the Secretary-General. This Convention shall apply to the territory or territories named in such notification from the date of its receipt by the Secretary-General. In those cases where the previous consent of the non-metropolitan territory is not required, the Party concerned shall, at the time of signature, ratification or accession, declare the non-metropolitan territory or territories to which this Convention applies.

ARTICLE 43

*Territories for the purposes of articles 19, 20, 21 and 31*

1. Any Party may notify the Secretary-General that, for the purposes of articles 19, 20, 21 and 31, one of its territories is divided into two or more territories, or that two or more of its territories are consolidated into a single territory.

2. Two or more Parties may notify the Secretary-General that, as the result of the establishment of a customs union between them, those Parties constitute a single territory for the purposes of articles 19, 20, 21 and 1.

3. Any notification under paragraph or 2 above shall take effect on 1 January of the year following the year in which the notification was made.

ARTICLE 44

*Termination of previous international treaties*

1. The provisions of this Convention, upon its coming into force, shall, as between Parties hereto, terminate and replace the provisions of the following treaties:

(*a*) International Opium Convention, signed at The Hague on 23 January 1912; [1]

(*b*) Agreement concerning the Manufacture of, Internal Trade in and Use of Prepared Opium, signed at Geneva on 11 February 1925; [2]

(*c*) International Opium Convention, signed at Geneva on 19 February 1925; [3]

(*d*) Convention for Limiting the Manufacture and Regulating the Distribution of Narcotic Drugs, signed at Geneva on 13 July 1931; [4]

(*e*) Agreement for the Control of Opium Smoking in the Far East, signed at Bangkok on 27 November 1931; [5]

(*f*) Protocol signed at Lake Success on 11 December 1946, [6] amending the Agreements, Conventions and Protocols on Narcotic Drugs concluded at The Hague on 23 January 1912, at Geneva on 11 February 1925 and 19 February 1925 and 13 July 1931, at Bangkok on 27 November 1931 and at Geneva on 26 June 1936,[7] except as it affects the last-named Convention;

(*g*) The Conventions and Agreements referred to in sub-paragraphs (*a*) to (*e*) as amended by the Protocol of 1946 referred to in sub-paragraph (*f*);

[1] TS 612; 38 Stat. 1912.
[2] 51 LNTS 337.
[3] 81 LNTS 317.
[4] TS 863; 48 Stat. 1543.
[5] 177 LNTS 373.
[6] TIAS 1671, 1859; 61 Stat. (2) 2230, 62 Stat. (2) 1796.
[7] 198 LNTS 299.
[Footnotes added by the Department of State.]

(h) Protocol signed at Paris on 19 November 1948[1] Bringing under International Control Drugs outside the Scope of the Convention of 13 July 1931 for Limiting the Manufacture and Regulating the Distribution of Narcotic Drugs, as amended by the Protocol signed at Lake Success on 11 December 1946;

(i) Protocol for Limiting and Regulating the Cultivation of the Poppy Plant, the Production of, International and Wholesale Trade in, and Use of Opium, signed at New York on 23 June 1953,[2] should that Protocol have come into force.

2. Upon the coming into force of this Convention, article 9 of the Convention for the Suppression of the Illicit Traffic in Dangerous Drugs, signed at Geneva on 26 June 1936, shall, between the Parties thereto which are also Parties to this Convention, be terminated, and shall be replaced by paragraph 2 (b) of article 36 of this Convention; provided that such a Party may by notification to the Secretary-General continue in force the said article 9.

ARTICLE 45

*Transitional provisions*

1. The functions of the Board provided for in article 9 shall, as from the date of the coming into force of this Convention (article 41, paragraph 1), be provisionally carried out by the Permanent Central Board constituted under chapter VI of the Convention referred to in article 44 (c) as amended, and by the Supervisory Body constituted under chapter II of the Convention referred to in article 44 (d) as amended, as such functions may respectively require.

2. The Council shall fix the date on which the new Board referred to in article 9 shall enter upon its duties. As from that date that Board shall, with respect to the States Parties to the treaties enumerated in article 44 which are not Parties to this Convention, undertake the functions of the Permanent Central Board and of the Supervisory Body referred to in paragraph 1.

ARTICLE 46

*Denunciation*

1. After the expiry of two years from the date of the coming into force of this Convention (article 41, paragraph 1) any Party may, on its own behalf or on behalf of a territory for which it has international responsibility, and which has withdrawn its consent given in accordance with article 42, denounce this Convention by an instrument in writing deposited with the Secretary-General.

2. The denunciation, if received by the Secretary-General on or before the first day of July in any year, shall take effect on the first day of January in the succeeding year, and, if received after the first day of July, shall take effect as if it had been received on or before the first day of July in the succeeding year.

3. This Convention shall be terminated if, as a result of denunciations made in accordance with paragraph 1, the conditions for its coming into force as laid down in article 41, paragraph 1, cease to exist.

ARTICLE 47

*Amendments*

1. Any Party may propose an amendment to this Convention. The text of any such amendment and the reasons therefor shall be communicated to the Secretary-General who shall communicate them to the Parties and to the Council. The Council may decide either:

(a) That a conference shall be called in accordance with Article 62, paragraph 4, of the Charter of the United Nations[1] to consider the proposed amendment; or

[1] TIAS 2308; 2 UST 1629.
[2] TIAS 5273; 14 UST 10.

[1] TS 993; 59 Stat. 1047.
[Footnotes added by the Department of State.]



(b) That the Parties shall be asked whether they accept the proposed amendment and also asked to submit to the Council any comments on the proposal.

2. If a proposed amendment circulated under paragraph 1 (b) of this article has not been rejected by any Party within eighteen months after it has been circulated, it shall thereupon enter into force. If however a proposed amendment is rejected by any Party, the Council may decide, in the light of comments received from Parties, whether a conference shall be called to consider such amendment.

ARTICLE 48

*Disputes*

1. If there should arise between two or more Parties a dispute relating to the interpretation or application of this Convention, the said Parties shall consult together with a view to the settlement of the dispute by negotiation, investigation, mediation, conciliation, arbitration, recourse to regional bodies, judicial process or other peaceful means of their own choice.

2. Any such dispute which cannot be settled in the manner prescribed shall be referred to the International Court of Justice for decision.

ARTICLE 49

*Transitional reservations*

1. A Party may at the time of signature, ratification or accession reserve the right to permit temporarily in any one of its territories:

(a) The quasi-medical use of opium;

(b) Opium smoking;

(c) Coca leaf chewing;

(d) The use of cannabis, cannabis resin, extracts and tinctures of cannabis for non-medical purposes; and

(e) The production and manufacture of and trade in the drugs referred to under (a) to (d) for the purposes mentioned therein.

2. The reservations under paragraph 1 shall be subject to the following restrictions:

(a) The activities mentioned in paragraph 1 may be authorized only to the extent that they were traditional in the territories in respect of which the reservation is made, and were there permitted on 1 January 1961.

(b) No export of the drugs referred to in paragraph 1 for the purposes mentioned therein may be permitted to a non-party or to a territory to which this Convention does not apply under article 42.

(c) Only such persons may be permitted to smoke opium as were registered by the competent authorities to this effect on 1 January 1964.

(d) The quasi-medical use of opium must be abolished within 15 years from the coming into force of this Convention as provided in paragraph 1 of article 41.

(e) Coca leaf chewing must be abolished within twenty-five years from the coming into force of this Convention as provided in paragraph 1 of article 41.

(f) The use of cannabis for other than medical and scientific purposes must be discontinued as soon as possible but in any case within twenty-five years from the coming into force of this Convention as provided in paragraph 1 of article 41.

(g) The production and manufacture of and trade in the drugs referred to in paragraph 1 for any of the uses mentioned therein must be reduced and finally abolished simultaneously with the reduction and abolition of such uses.

3. A Party making a reservation under paragraph 1 shall:

(a) Include in the annual report to be furnished to the Secretary-General, in accordance with article 18, paragraph 1 (a), an account of the progress made in the preceding year towards the abolition of the use, production, manufacture or trade referred to under paragraph 1; and

(b) Furnish to the Board separate estimates (article 19) and statistical returns (article 20) in respect of the reserved activities in the manner and form prescribed by the Board.

4. (a) If a Party which makes a reservation under paragraph 1 fails to furnish:

(i) The report referred to in paragraph 3 (a) within six months after the end of the year to which the information relates;

(ii) The estimates referred to in paragraph 3 (b) within three months after the date fixed for that purpose by the Board in accordance with article 12, paragraph 1;

(iii) The statistics referred to in paragraph 3 (b) within three months after the date on which they are due in accordance with article 20, paragraph 2,

the Board or the Secretary-General, as the case may be, shall send to the Party concerned a notification of the delay, and shall request such information within a period of three months after the receipt of that notification.

(b) If the Party fails to comply within this period with the request of the Board or the Secretary-General, the reservation in question made under paragraph 1 shall cease to be effective.

5. A State which has made reservations may at any time by notification in writing withdraw all or part of its reservations.

### Article 50

*Other reservations*

1. No reservations other than those made in accordance with article 49 or with the following paragraphs shall be permitted.

2. Any State may at the time of signature, ratification or accession make reservations in respect of the following provisions of this Convention: article 12, paragraphs 2 and 3; article 13, paragraph 2; article 14, paragraphs 1 and 2; article 31, paragraph 1 (b), and article 48.

3. A State which desires to become a Party but wishes to be authorized to make reservations other than those made in accordance with paragraph 2 of this article or with article 49 may inform the Secretary-General of such intention. Unless by the end of twelve months after the date of the Secretary-General's communication of the reservation concerned, this reservation has been objected to by one third of the States that have ratified or acceded to this Convention before the end of that period, it shall be deemed to be permitted, it being understood however that States which have objected to the reservation need not assume towards the reserving State any legal obligation under this Convention which is affected by the reservation.

4. A State which has made reservations may at any time by notification in writing withdraw all or part of its reservations.

### Article 51

*Notifications*

The Secretary-General shall notify to all the States referred to in paragraph 1 of article 40:

(a) Signatures, ratifications and accessions in accordance with article 40;

(b) The date upon which this Convention enters into force in accordance with article 41;

(c) Denunciations in accordance with article 46; and

(d) Declarations and notifications under articles 42, 43, 47, 49 and 50.

Case 1:05-mj-01609-CBS Document 12-2 Filed 10/26/2005 Page 39 of 40

IN WITNESS THEREOF, the undersigned, duly authorized, have signed this Convention on behalf of their respective Governments:

DONE at New York, this thirtieth day of March one thousand nine hundred and sixty one, in a single copy, which shall be deposited in the archives of the United Nations, and of which certified true copies shall be transmitted to all the Members of the United Nations and to the other States referred to in article 40, paragraph 1.

# MULTILATERAL

## Amendment of the Single Convention on Narcotic Drugs, 1961

*Protocol done at Geneva March 25, 1972;*
*Ratification advised by the Senate of the United States of America September 18, 1972;*
*Ratified by the President of the United States of America October 24, 1972;*
*Ratification of the United States of America deposited with the Secretary-General of the United Nations November 1, 1972;*
*Proclaimed by the President of the United States of America August 29, 1975;*
*Entered into force August 8, 1975.*

---

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

## A PROCLAMATION

CONSIDERING THAT:

The Protocol Amending the Single Convention on Narcotic Drugs, 1961, was opened for signature at Geneva on March 25, 1972, and was signed on behalf of the United States of America on that date, a certified copy of which Protocol in the English, Spanish, French and Russian languages, is hereto annexed;

The Senate of the United States of America by its resolution of September 18, 1972, two-thirds of the Senators present concurring therein, gave its advice and consent to ratification of the Protocol;

The President of the United States of America on October 24, 1972, ratified the Protocol, in pursuance of the advice and consent of the Senate, and the United States of America deposited its instrument of ratification with the Secretary-General of the United Nations on November 1, 1972;

Pursuant to the provisions of Article 18 of the Protocol, the Protocol entered into force on August 8, 1975;

NOW, THEREFORE, I, Gerald R. Ford, President of the United States of America, proclaim and make public the Protocol, to the end that it shall be observed and fulfilled with good faith on and after August 8.

1975, by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof.

IN TESTIMONY WHEREOF, I have signed this proclamation and caused the Seal of the United States of America to be affixed.

DONE at the city of Washington this twenty-ninth day of August in the year of our Lord one thousand nine hundred seventy-five and of the Independence of the United States of America the two hundredth.

[SEAL]

GERALD R. FORD

By the President:
ROBERT S. INGERSOLL
*Acting Secretary of State*

# PROTOCOL
# AMENDING THE SINGLE CONVENTION ON NARCOTIC DRUGS, 1961

UNITED NATIONS
1972

PROTOCOL AMENDING THE SINGLE CONVENTION ON NARCOTIC DRUGS, 1961

PREAMBLE

The Parties to the present Protocol,

Considering the provisions of the Single Convention on Narcotic Drugs, 1961, done at New York on 30 March 1961 [1] (hereinafter called the Single Convention),

Desiring to amend the Single Convention,

Have agreed as follows:

Article 1

Amendments to article 2, paragraphs 4, 6 and 7 of the Single Convention

Article 2, paragraphs 4, 6 and 7, of the Single Convention shall be amended to read as follows:

"4. Preparations in Schedule III are subject to the same measures of control as preparations containing drugs in Schedule II except that article 31, paragraphs 1 (b) and 3 to 15 and, as regards their acquisition and retail distribution, article 34, paragraph (b), need not apply, and that for the purpose of estimates (article 19) and statistics (article 20) the information required shall be restricted to the quantities of drugs used in the manufacture of such preparations.

6. In addition to the measures of control applicable to all drugs in Schedule I, opium is subject to the provisions of article 19, paragraph 1, sub-paragraph (f), and of articles 21 bis, 23 and 24, the coca leaf to those of articles 26 and 27 and cannabis to those of article 28.

7. The opium poppy, the coca bush, the cannabis plant, poppy straw and cannabis leaves are subject to the control measures prescribed in article 19, paragraph 1, sub-paragraph (e), article 20, paragraph 1, sub-paragraph (g), article 21 bis and in articles 22 to 24; 22, 26 and 27; 22 and 28; 25; and 28, respectively."

[1] TIAS 6298, 6423, 6458, 6795, 7223, 7817, 7945; 18 UST 1407, 3279; 19 UST 4668; 20 UST 4064; 22 UST 1808; 25 UST 651; 25 UST 2772.

[Footnote added by the Department of State.]

Article 2

Amendments to the title of article 9 of the Single Convention and its paragraph 1 and insertion of new paragraphs 4 and 5

The title of article 9 of the Single Convention shall be amended to read as follows:

"Composition and Functions of the Board"

Article 9, paragraph 1, of the Single Convention shall be amended to read as follows:

"1. The Board shall consist of thirteen members to be elected by the Council as follows:

(a) Three members with medical, pharmacological or pharmaceutical experience from a list of at least five persons nominated by the World Health Organization; and

(b) Ten members from a list of persons nominated by the Members of the United Nations and by Parties which are not Members of the United Nations."

The following new paragraphs shall be inserted after paragraph 3 of article 9 of the Single Convention:

"4. The Board, in co-operation with Governments, and subject to the terms of this Convention, shall endeavour to limit the cultivation, production, manufacture and use of drugs to an adequate amount required for medical and scientific purposes, to ensure their availability for such purposes and to prevent illicit cultivation, production and manufacture of, and illicit trafficking in and use of, drugs.

5. All measures taken by the Board under this Convention shall be those most consistent with the intent to further the co-operation of Governments with the Board and to provide the mechanism for a continuing dialogue between Governments and the Board which will lend assistance to and facilitate effective national action to attain the aims of this Convention."

Article 3

Amendments to article 10, paragraphs 1 and 4, of the Single Convention

Article 10, paragraphs 1 and 4, of the Single Convention shall be amended to read as follows:

"1. The members of the Board shall serve for a period of five years, and may be re-elected.

4. The Council, on the recommendation of the Board, may dismiss a member of the Board who has ceased to fulfil the conditions required for membership by paragraph 2 of article 9. Such recommendation shall be made by an affirmative vote of nine members of the Board."

Article 4

Amendment to article 11, paragraph 3, of the Single Convention

Article 11, paragraph 3, of the Single Convention shall be amended to read as follows:

"3. The quorum necessary at meetings of the Board shall consist of eight members."

Article 5

Amendment to article 12, paragraph 5, of the Single Convention

Article 12, paragraph 5, of the Single Convention shall be amended to read as follows:

"5. The Board, with a view to limiting the use and distribution of drugs to an adequate amount required for medical and scientific purposes and to ensuring their availability for such purposes, shall as expeditiously as possible confirm the estimates, including supplementary estimates, or, with the consent of the Government concerned, may amend such estimates. In case of a disagreement between the Government and the Board, the latter shall have the right to establish, communicate and publish its own estimates, including supplementary estimates."

Article 6

Amendments to article 14, paragraphs 1 and 2, of the Single Convention

Article 14, paragraphs 1 and 2, of the Single Convention shall be amended to read as follows:

"1. (a) If, on the basis of its examination of information submitted by Governments to the Board under the provisions of this Convention, or of information communicated by United Nations organs or by specialized agencies or, provided that they are approved by the Commission on the Board's recommendation, by either other intergovernmental organizations or international non-governmental organizations which have direct competence in the subject matter and which are in consultative status with the Economic and Social Council under Article 71 of the Charter of the United Nations or which enjoy a similar

status by special agreement with the Council, the Board has objective reasons to believe that the aims of this Convention are being seriously endangered by reason of the failure of any Party, country or territory to carry out the provisions of this Convention, the Board shall have the right to propose to the Government concerned the opening of consultations or to request it to furnish explanations. If, without any failure in implementing the provisions of the Convention, a Party or a country or territory has become, or if there exists evidence of a serious risk that it may become, an important centre of illicit cultivation, production or manufacture of, or traffic in or consumption of drugs, the Board has the right to propose to the Government concerned the opening of consultations. Subject to the right of the Board to call the attention of the Parties, the Council and the Commission to the matter referred to in sub-paragraph (d) below, the Board shall treat as confidential a request for information and an explanation by a Government or a proposal for consultations and the consultations held with a Government under this sub-paragraph.

(b) After taking action under sub-paragraph (a) above, the Board, if satisfied that it is necessary to do so, may call upon the Government concerned to adopt such remedial measures as shall seem under the circumstances to be necessary for the execution of the provisions of this Convention.

(c) The Board may, if it thinks such action necessary for the purpose of assessing a matter referred to in sub-paragraph (a) of this paragraph, propose to the Government concerned that a study of the matter be carried out in its territory by such means as the Government deems appropriate. If the Government concerned decides to undertake this study, it may request the Board to make available the expertise and the services of one or more persons with the requisite competence to assist the officials of the Government in the proposed study. The person or persons whom the Board intends to make available shall be subject to the approval of the Government. The modalities of this study and the time-limit within which the study has to be completed shall be determined by consultation between the Government and the Board. The Government shall communicate to the Board the results of the study and shall indicate the remedial measures that it considers necessary to take.

(d) If the Board finds that the Government concerned has failed to give satisfactory explanations when called upon to do so under sub-paragraph (a) above, or has failed to adopt any remedial measures which it has been called upon to take under sub-paragraph (b) above, or that there is a serious situation that needs co-operative action at the international level with a

view to remedying it, it may call the attention of the Parties, the Council and the Commission to the matter. The Board shall so act if the aims of this Convention are being seriously endangered and it has not been possible to resolve the matter satisfactorily in any other way. It shall also so act if it finds that there is a serious situation that needs co-operative action at the international level with a view to remedying it and that bringing such a situation to the notice of the Parties, the Council and the Commission is the most appropriate method of facilitating such co-operative action; after considering the reports of the Board, and of the Commission if available on the matter, the Council may draw the attention of the General Assembly to the matter.

2. The Board, when calling the attention of the Parties, the Council and the Commission to a matter in accordance with paragraph 1 (d) above, may, if it is satisfied that such a course is necessary, recommend to Parties that they stop the import of drugs, the export of drugs, or both, from or to the country or territory concerned, either for a designated period or until the Board shall be satisfied as to the situation in that country or territory. The State concerned may bring the matter before the Council."

Article 7

New article 14 bis

The following new article shall be inserted after article 14 of the Single Convention:

"Article 14 bis

Technical and Financial Assistance

In cases which it considers appropriate and either in addition or as an alternative to measures set forth in article 14, paragraphs 1 and 2, the Board, with the agreement of the Government concerned, may recommend to the competent United Nations organs and to the specialized agencies that technical or financial assistance, or both, be provided to the Government in support of its efforts to carry out its obligations under this Convention, including those set out or referred to in articles 2, 35, 38 and 38 bis."

Article 8

Amendment to article 16 of the Single Convention

Article 16 of the Single Convention shall be amended to read as follows:

"The secretariat services of the Commission and the Board shall be furnished by the Secretary-General. In particular, the Secretary of the Board shall be appointed by the Secretary-General in consultation with the Board."

Article 9

Amendments to article 19, paragraphs 1, 2 and 5, of the Single Convention

Article 19, paragraphs 1, 2 and 5, of the Single Convention shall be amended to read as follows:

"1. The Parties shall furnish to the Board each year for each of their territories, in the manner and form prescribed by the Board, estimates on forms supplied by it in respect of the following matters:

(a) Quantities of drugs to be consumed for medical and scientific purposes;

(b) Quantities of drugs to be utilized for the manufacture of other drugs, of preparations in Schedule III, and of substances not covered by this Convention;

(c) Stocks of drugs to be held as at 31 December of the year to which the estimates relate;

(d) Quantities of drugs necessary for addition to special stocks;

(e) The area (in hectares) and the geographical location of land to be used for the cultivation of the opium poppy;

(f) Approximate quantity of opium to be produced;

(g) The number of industrial establishments which will manufacture synthetic drugs; and

(h) The quantities of synthetic drugs to be manufactured by each of the establishments referred to in the preceding sub-paragraph.

2. (a) Subject to the deductions referred to in paragraph 3 of article 21, the total of the estimates for each territory and each drug except opium and synthetic drugs shall consist of the sum of the amounts specified under sub-paragraphs (a), (b) and (d) of paragraph 1 of this article, with the addition of any amount required to bring the actual stocks on hand at 31 December of the preceding year to the level estimated as provided in sub-paragraph (c) of paragraph 1.

(b) Subject to the deductions referred to in paragraph 3 of article 21 regarding imports and in paragraph 2 of article 21 bis, the total of the estimates for opium for each territory shall consist either of the sum of the amounts specified under sub-paragraphs (a), (b) and (d) of paragraph 1 of this article, with the addition of any amount required to bring the actual stocks on hand at 31 December of the preceding year to the level estimated as provided in sub-paragraph (c) of paragraph 1, or of the amount specified under sub-paragraph (f) of paragraph 1 of this article, whichever is higher.

(c) Subject to the deductions referred to in paragraph 3 of article 21, the total of the estimates for each territory for each synthetic drug shall consist either of the sum of the amounts specified under sub-paragraphs (a), (b) and (d) of paragraph 1 of this article, with the addition of any amount required to bring the actual stocks on hand at 31 December of the preceding year to the level estimated as provided in sub-paragraph (c) of paragraph 1, or of the sum of the amounts specified under sub-paragraph (h) of paragraph 1 of this article, whichever is higher.

(d) The estimates furnished under the preceding sub-paragraphs of this paragraph shall be appropriately modified to take into account any quantity seized and thereafter released for licit use as well as any quantity taken from special stocks for the requirements of the civilian population.

5. Subject to the deductions referred to in paragraph 3 of article 21, and account being taken where appropriate of the provisions of article 21 bis, the estimates shall not be exceeded."

Article 10

Amendments to article 20 of the Single Convention

Article 20 of the Single Convention shall be amended to read as follows:

"1. The Parties shall furnish to the Board for each of their territories, in the manner and form prescribed by the Board, statistical returns on forms supplied by it in respect of the following matters:

(a) Production or manufacture of drugs;

(b) Utilization of drugs for the manufacture of other drugs, of preparations in Schedule III and of substances not covered by this Convention, and utilization of poppy straw for the manufacture of drugs;

(c) Consumption of drugs;

(d) Imports and exports of drugs and poppy straw;

(e) Seizures of drugs and disposal thereof;

(f) Stocks of drugs as at 31 December of the year to which the returns relate; and

(g) Ascertainable area of cultivation of the opium poppy.

2. (a) The statistical returns in respect of the matters referred to in paragraph 1, except sub-paragraph (d), shall be prepared annually and shall be furnished to the Board not later than 30 June following the year to which they relate.

(b) The statistical returns in respect to the matters referred to in sub-paragraph (d) of paragraph 1 shall be prepared quarterly and shall be



furnished to the Board within one month after the end of the quarter to which they relate.

3. The Parties are not required to furnish statistical returns respecting special stocks, but shall furnish separately returns respecting drugs imported into or procured within the country or territory for special purposes, as well as quantities of drugs withdrawn from special stocks to meet the requirements of the civilian population."

Article 11

New article 21 bis

The following new article shall be inserted after article 21 of the Single Convention:

"Article 21 bis

Limitation of Production of Opium

1. The production of opium by any country or territory shall be organized and controlled in such manner as to ensure that, as far as possible, the quantity produced in any one year shall not exceed the estimate of opium to be produced as established under paragraph 1 (f) of article 19.

2. If the Board finds on the basis of information at its disposal in accordance with the provisions of this Convention that a Party which has submitted an estimate under paragraph 1 (f) of article 19 has not limited opium produced within its borders to licit purposes in accordance with relevant estimates and that a significant amount of opium produced, whether licitly or illicitly, within the borders of such a Party, has been introduced into the illicit traffic, it may, after studying the explanations of the Party concerned, which shall be submitted to it within one month after notification of the finding in question, decide to deduct all, or a portion, of such an amount from the quantity to be produced and from the total of the estimates as defined in paragraph 2 (b) of article 19 for the next year in which such a deduction can be technically accomplished, taking into account the season of the year and contractual commitments to export opium. This decision shall take effect ninety days after the Party concerned is notified thereof.

3. After notifying the Party concerned of the decision it has taken under paragraph 2 above with regard to a deduction, the Board shall consult with that Party in order to resolve the situation satisfactorily.

4. If the situation is not satisfactorily resolved, the Board may utilize the provisions of article 14 where appropriate.

5. In taking its decision with regard to a deduction under paragraph 2 above, the Board shall take into account not only all relevant circumstances including those giving rise to the illicit traffic problem referred to in paragraph 2 above, but also any relevant new control measures which may have been adopted by the Party."

Article 12

Amendment to article 22 of the Single Convention

Article 22 of the Single Convention shall be amended to read as follows:

"1. Whenever the prevailing conditions in the country or a territory of a Party render the prohibition of the cultivation of the opium poppy, the coca bush or the cannabis plant the most suitable measure, in its opinion, for protecting the public health and welfare and preventing the diversion of drugs into the illicit traffic, the Party concerned shall prohibit cultivation.

2. A Party prohibiting cultivation of the opium poppy or the cannabis plant shall take appropriate measures to seize any plants illicitly cultivated and to destroy them, except for small quantities required by the Party for scientific or research purposes."

Article 13

Amendment to article 35 of the Single Convention

Article 35 of the Single Convention shall be amended to read as follows:

"Having due regard to their constitutional, legal and administrative systems, the Parties shall:

(a) Make arrangements at the national level for co-ordination of preventive and repressive action against the illicit traffic; to this end they may usefully designate an appropriate agency responsible for such co-ordination;

(b) Assist each other in the campaign against the illicit traffic in narcotic drugs;

(c) Co-operate closely with each other and with the competent international organizations of which they are members with a view to maintaining a co-ordinated campaign against the illicit traffic;

(d) Ensure that international co-operation between the appropriate agencies be conducted in an expeditious manner;

(e) Ensure that where legal papers are transmitted internationally for the purposes of a prosecution, the transmittal be effected in an expeditious manner to the bodies designated by the Parties; this requirement shall be



without prejudice to the right of a Party to require that legal papers be sent to it through the diplomatic channel;

(f) Furnish, if they deem it appropriate, to the Board and the Commission through the Secretary-General, in addition to information required by article 18, information relating to illicit drug activity within their borders, including information on illicit cultivation, production, manufacture and use of, and on illicit trafficking in, drugs; and

(g) Furnish the information referred to in the preceding paragraph as far as possible in such manner and by such dates as the Board may request; if requested by a Party, the Board may offer its advice to it in furnishing the information and in endeavouring to reduce the illicit drug activity within the borders of that Party."

## Article 14

### Amendments to article 36, paragraphs 1 and 2, of the Single Convention

Article 36, paragraphs 1 and 2, of the Single Convention shall be amended to read as follows:

"1. (a) Subject to its constitutional limitations, each Party shall adopt such measures as will ensure that cultivation, production, manufacture, extraction, preparation, possession, offering, offering for sale, distribution, purchase, sale, delivery on any terms whatsoever, brokerage, dispatch, dispatch in transit, transport, importation and exportation of drugs contrary to the provisions of this Convention, and any other action which in the opinion of such Party may be contrary to the provisions of this Convention, shall be punishable offences when committed intentionally, and that serious offences shall be liable to adequate punishment particularly by imprisonment or other penalties of deprivation of liberty.

(b) Notwithstanding the preceding sub-paragraph, when abusers of drugs have committed such offences, the Parties may provide, either as an alternative to conviction or punishment or in addition to conviction or punishment, that such abusers shall undergo measures of treatment, education, after-care, rehabilitation and social reintegration in conformity with paragraph 1 of article 38.

2. Subject to the constitutional limitations of a Party, its legal system and domestic law,

(a) (i) Each of the offences enumerated in paragraph 1, if committed in different countries, shall be considered as a distinct offence;

(ii) Intentional participation in, conspiracy to commit and attempts to commit, any of such offences, and preparatory acts and financial operations in connexion with the offences referred to in this article, shall be punishable offences as provided in paragraph 1;

(iii) Foreign convictions for such offences shall be taken into account for the purpose of establishing recidivism; and

(iv) Serious offences heretofore referred to committed either by nationals or by foreigners shall be prosecuted by the Party in whose territory the offence was committed, or by the Party in whose territory the offender is found if extradition is not acceptable in conformity with the law of the Party to which application is made, and if such offender has not already been prosecuted and judgement given.

(b) (i) Each of the offences enumerated in paragraphs 1 and 2 (a) (ii) of this article shall be deemed to be included as an extraditable offence in any extradition treaty existing between Parties. Parties undertake to include such offences as extraditable offences in every extradition treaty to be concluded between them.

(ii) If a Party which makes extradition conditional on the existence of a treaty receives a request for extradition from another Party with which it has no extradition treaty, it may at its option consider this Convention as the legal basis for extradition in respect of the offences enumerated in paragraphs 1 and 2 (a) (ii) of this article. Extradition shall be subject to the other conditions provided by the law of the requested Party.

(iii) Parties which do not make extradition conditional on the existence of a treaty shall recognize the offences enumerated in paragraphs 1 and 2 (a) (ii) of this article as extraditable offences between themselves, subject to the conditions provided by the law of the requested Party.

(iv) Extradition shall be granted in conformity with the law of the Party to which application is made, and, notwithstanding sub-paragraphs (b)(i), (ii) and (iii) of this paragraph, the Party shall have the right to refuse to grant the extradition in cases where the competent authorities consider that the offence is not sufficiently serious."

Article 15

Amendments to article 38 of the Single Convention and its title

Article 38 of the Single Convention and its title shall be amended to read as follows:

"Measures against the Abuse of Drugs

1. The Parties shall give special attention to and take all practicable measures for the prevention of abuse of drugs and for the early identification, treatment, education, after-care, rehabilitation and social reintegration of the persons involved and shall co-ordinate their efforts to these ends.

2. The Parties shall as far as possible promote the training of personnel in the treatment, after-care, rehabilitation and social reintegration of abusers of drugs.

3. The Parties shall take all practicable measures to assist persons whose work so requires to gain an understanding of the problems of abuse of drugs and of its prevention, and shall also promote such understanding among the general public if there is a risk that abuse of drugs will become widespread."

Article 16

New article 38 bis

The following new article shall be inserted after article 38 of the Single Convention:

"Article 38 bis

Agreements on Regional Centres

If a Party considers it desirable as part of its action against the illicit traffic in drugs, having due regard to its constitutional, legal and administrative systems, and, if it so desires, with the technical advice of the Board or the specialized agencies, it shall promote the establishment, in consultation with other interested Parties in the region, of agreements which contemplate the development of regional centres for scientific research and education to combat the problems resulting from the illicit use of and traffic in drugs."

Article 17

Languages of the Protocol and procedure for signature, ratification and accession

1. This Protocol, of which the Chinese, English, French, Russian and Spanish texts are equally authentic, shall be open for signature until 31 December 1972 on behalf of any Party or signatory to the Single Convention.

2. This Protocol is subject to ratification by States which have signed it and have ratified or acceded to the Single Convention. The instruments of ratification shall be deposited with the Secretary-General.

3. This Protocol shall be open after 31 December 1972 for accession by any Party to the Single Convention which has not signed this Protocol. The instruments of accession shall be deposited with the Secretary-General.

Article 18

Entry into force

1. This Protocol, together with the amendments which it contains, shall come into force on the thirtieth day following the date on which the fortieth instrument of ratification or accession is deposited in accordance with article 17.

2. In respect of any other State depositing an instrument of ratification or accession after the date of deposit of the said fortieth instrument, this Protocol shall come into force on the thirtieth day after the deposit by that State of its instrument of ratification or accession.

Article 19

Effect of entry into force

Any State which becomes a Party to the Single Convention after the entry into force of this Protocol pursuant to paragraph 1 of article 18 above shall, failing an expression of a different intention by that State:

(a) be considered as a Party to the Single Convention as amended; and

(b) be considered as a Party to the unamended Single Convention in relation to any Party to that Convention not bound by this Protocol.

Article 20

Transitional provisions

1. The functions of the International Narcotics Control Board provided for in the amendments contained in this Protocol shall, as from the date of the coming into force of this Protocol pursuant to paragraph 1 of article 18 above, be performed by the Board as constituted by the unamended Single Convention.

2. The Economic and Social Council shall fix the date on which the Board as constituted under the amendments contained in this Protocol shall enter upon its duties. As from that date the Board as so constituted shall, with respect to those Parties to the unamended Single Convention and to those



Parties to the treaties enumerated in article 44 thereof which are not Parties to this Protocol, undertake the functions of the Board as constituted under the unamended Single Convention.

3. Of the members elected at the first election after the increase in the membership of the Board from eleven to thirteen members the terms of six members shall expire at the end of three years and the terms of the other seven members shall expire at the end of five years.

4. The members of the Board whose terms are to expire at the end of the abovementioned initial period of three years shall be chosen by lot to be drawn by the Secretary-General immediately after the first election has been completed.

## Article 21

## Reservations

1. Any State may, at the time of signature or ratification of or accession to this Protocol, make a reservation in respect of any amendment contained herein other than the amendments to article 2, paragraphs 6 and 7 (article 1 of this Protocol), article 9, paragraphs 1, 4 and 5 (article 2 of this Protocol), article 10, paragraphs 1 and 4 (article 3 of this Protocol), article 11 (article 4 of this Protocol), article 14 bis (article 7 of this Protocol), article 16 (article 8 of this Protocol), article 22 (article 12 of this Protocol), article 35 (article 13 of this Protocol), article 36, paragraph 1 (b) (article 14 of this Protocol), article 38 (article 15 of this Protocol) and article 38 bis (article 16 of this Protocol).

2. A State which has made reservations may at any time by notification in writing withdraw all or part of its reservations.

## Article 22

The Secretary-General shall transmit certified true copies of this Protocol to all the Parties and signatories to the Single Convention. When this Protocol has entered into force pursuant to paragraph 1 of article 18

above, the Secretary-General shall prepare a text of the Single Convention as amended by this Protocol, and shall transmit certified true copies of it to all States Parties or entitled to become Parties to the Convention as amended.

DONE at Geneva, this twenty-fifth day of March one thousand nine hundred and seventy-two, in a single copy, which shall be deposited in the archives of the United Nations.

IN WITNESS WHEREOF the undersigned, duly authorized, have signed this Protocol on behalf of their respective Governments:



# MULTILATERAL

## Narcotic Drugs: Psychotropic Substances

*Convention done at Vienna February 21, 1971, as rectified by the procès-verbal of August 15, 1973;*
*Ratification advised by the Senate of the United States of America, subject to a reservation, March 20, 1980;*
*Ratified by the President of the United States of America, subject to said reservation, April 7, 1980;*
*Ratification of the United States of America deposited with the Secretary-General of the United Nations April 16, 1980;*
*Proclaimed by the President of the United States of America May 12, 1980;*
*Entered into force with respect to the United States of America July 15, 1980.*

---

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

## A PROCLAMATION

CONSIDERING THAT:

The Convention on Psychotropic Substances was signed on behalf of the United States of America at Vienna on February 21, 1971, the text of which is hereto annexed;

The Senate of the United States of America by its resolution of March 20, 1980, two-thirds of the Senators present concurring therein, gave its advice and consent to ratification of the Convention, subject to a reservation as follows:

> That in accord with paragraph 4 of Article 32 of the Convention, peyote harvested and distributed for use by the Native American Church in its religious rites is excepted from the provisions of Article 7 of the Convention of Psychotropic Substances.

The President of the United States of America on April 7, 1980, ratified the Convention, subject to the said reservation, in pursuance of the advice and consent of the Senate, and the United States of America deposited its instrument of ratification with the Secretary-General of the United Nations on April 16, 1980;

Pursuant to the provisions of the Convention, the Convention, subject to the said reservation, enters into force for the United States of America on July 15, 1980.

NOW, THEREFORE, I, Jimmy Carter, President of the United States of America, proclaim and make public the Convention, subject to the said reservation, to the end that it shall be observed and fulfilled with good faith on and after July 15, 1980, by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof.

IN TESTIMONY WHEREOF, I have signed this proclamation and caused the Seal of the United States of America to be affixed.

DONE at the city of Washington this twelfth day of May in the year of our Lord one thousand nine hundred eighty and of the Independence of the United States of America the two hundred fourth.

[SEAL]

By the President: JIMMY CARTER

EDMUND S. MUSKIE
*Secretary of State*

CONVENTION ON PSYCHOTROPIC SUBSTANCES

PREAMBLE

The Parties,

Being concerned with the health and welfare of mankind,

Noting with concern the public health and social problems resulting from the abuse of certain psychotropic substances,

Determined to prevent and combat abuse of such substances and the illicit traffic to which it gives rise,

Considering that rigorous measures are necessary to restrict the use of such substances to legitimate purposes,

Recognizing that the use of psychotropic substances for medical and scientific purposes is indispensable and that their availability for such purposes should not be unduly restricted,

Believing that effective measures against abuse of such substances require co-ordination and universal action,

Acknowledging the competence of the United Nations in the field of control of psychotropic substances and desirous that the international organs concerned should be within the framework of that Organization,

Recognizing that an international convention is necessary to achieve these purposes,

Agree as follows:

ARTICLE 1

Use of terms

Except where otherwise expressly indicated, or where the context otherwise requires, the following terms in this Convention have the meanings given below:

(a) "Council" means the Economic and Social Council of the United Nations.

(b) "Commission" means the Commission on Narcotic Drugs of the Council.

(c) "Board" means the International Narcotics Control Board provided for in the Single Convention on Narcotic Drugs, 1961.[1]

(d) "Secretary-General" means the Secretary-General of the United Nations.

(e) "Psychotropic substance" means any substance, natural or synthetic, or any natural material in Schedule I, II, III or IV.

(f) "Preparation" means:

(i) any solution or mixture, in whatever physical state, containing one or more psychotropic substances, or

(ii) one or more psychotropic substances in dosage form.

(g) "Schedule I", "Schedule II", "Schedule III" and "Schedule IV" mean the correspondingly numbered lists of psychotropic substances annexed to this Convention, as altered in accordance with article 2.

(h) "Export" and "import" mean in their respective connotations the physical transfer of a psychotropic substance from one State to another State.

(i) "Manufacture" means all processes by which psychotropic substances may be obtained, and includes refining as well as the transformation of psychotropic substances into other psychotropic substances. The term also includes the making of preparations other than those made on prescription in pharmacies.

(j) "Illicit traffic" means manufacture of or trafficking in psychotropic substances contrary to the provisions of this Convention.

(k) "Region" means any part of a State which pursuant to article 28 is treated as a separate entity for the purposes of this Convention.

(l) "Premises" means buildings or parts of buildings, including the appertaining land.

---

[1] TIAS 6298, 6423, 6458, 6795, 7223, 7817, 7945, 8118; 18 UST 1407, 3279; 19 UST 4668; 20 UST 4064; 22 UST 1808; 25 UST 651, 2772; 26 UST 1439. [Footnote added by the Department of State.]

ARTICLE 2

Scope of control of substances

1.   If a Party or the World Health Organization has information relating to a substance not yet under international control which in its opinion may require the addition of that substance to any of the Schedules of this Convention, it shall notify the Secretary-General and furnish him with the information in support of that notification.  The foregoing procedure shall also apply when a Party or the World Health Organization has information justifying the transfer of a substance from one Schedule to another among those Schedules, or the deletion of a substance from the Schedules.

2.   The Secretary-General shall transmit such notification, and any information which he considers relevant, to the Parties, to the Commission and, when the notification is made by a Party, to the World Health Organization.

3.   If the information transmitted with such a notification indicates that the substance is suitable for inclusion in Schedule I or Schedule II pursuant to paragraph 4, the Parties shall examine, in the light of all information available to them, the possibility of the provisional application to the substance of all measures of control applicable to substances in Schedule I or Schedule II, as appropriate.

4.   If the World Health Organization finds:

   (a)  that the substance has the capacity to produce

      (i)  (1)  a state of dependence, and

           (2)  central nervous system stimulation or depression, resulting
                in hallucinations or disturbances in motor function or
                thinking or behaviour or perception or mood, or

      (ii)  similar abuse and similar ill effects as a substance in
            Schedule I, II, III or IV, and

   (b)  that there is sufficient evidence that the substance is being or is
        likely to be abused so as to constitute a public health and social
        problem warranting the placing of the substance under international
        control,

the World Health Organization shall communicate to the Commission an assessment of the substance, including the extent or likelihood of abuse, the degree of seriousness of the public health and social problem and the degree of usefulness of the substance in medical therapy, together with recommendations on control measures, if any, that would be appropriate in the light of its assessment.

5.   The Commission, taking into account the communication from the World Health Organization, whose assessments shall be determinative as to medical and scientific matters, and bearing in mind the economic, social, legal, administrative and other factors it may consider relevant, may add the substance to Schedule I, II, III or IV. The Commission may seek further information from the World Health Organization or from other appropriate sources.

6.   If a notification under paragraph 1 relates to a substance already listed in one of the Schedules, the World Health Organization shall communicate to the Commission its new findings, any new assessment of the substance it may make in accordance with paragraph 4 and any new recommendations on control measures it may find appropriate in the light of that assessment.  The Commission, taking into account the communication from the World Health Organization as under paragraph 5 and bearing in mind the factors referred to in that paragraph, may decide to transfer the substance from one Schedule to another or to delete it from the Schedules.

7.   Any decision of the Commission taken pursuant to this article shall be communicated by the Secretary-General to all States Members of the United Nations, to non-member States Parties to this Convention, to the World Health Organization and to the Board.  Such decision shall become fully effective with respect to each Party 180 days after the date of such communication, except for any Party which, within that period, in respect of a decision adding a substance to a Schedule, has transmitted to the Secretary-General a written notice that, in view of exceptional circumstances, it is not in a position to give effect with respect to that substance to all of the provisions of the Convention applicable to substances in that Schedule. Such notice shall state the reasons for this exceptional action.  Notwithstanding its notice, each Party shall apply, as a minimum, the control measures listed below:

   (a)  A Party having given such notice with respect to a previously uncontrolled substance added to Schedule I shall take into account, as far as possible, the special control measures enumerated in article 7 and, with respect to that substance, shall:

        (i)   require licences for manufacture, trade and distribution as provided
              in article 8 for substances in Schedule II;

        (ii)  require medical prescriptions for supply or dispensing as provided in
              article 9 for substances in Schedule II;

        (iii) comply with the obligations relating to export and import provided in
              article 12, except in respect to another Party having given such notice
              for the substance in question;



    (iv)  comply with the obligations provided in article 13 for substances in Schedule II in regard to prohibition of and restrictions on export and import;

    (v)  furnish statistical reports to the Board in accordance with paragraph 4 (a) of article 16;  and

    (vi)  adopt measures in accordance with article 22 for the repression of acts contrary to laws or regulations adopted pursuant to the foregoing obligations.

(b)  A Party having given such notice with regard to a previously uncontrolled substance added to Schedule II shall, with respect to that substance:

    (i)  require licences for manufacture, trade and distribution in accordance with article 8;

    (ii)  require medical prescriptions for supply or dispensing in accordance with article 9;

    (iii)  comply with the obligations relating to export and import provided in article 12, except in respect to another Party having given such notice for the substance in question;

    (iv)  comply with the obligations of article 13 in regard to prohibition of and restrictions on export and import;

    (v)  furnish statistical reports to the Board in accordance with paragraphs 4 (a), (c) and (d) of article 16;  and

    (vi)  adopt measures in accordance with article 22 for the repression of acts contrary to laws or regulations adopted pursuant to the foregoing obligations.

(c)  A Party having given such notice with regard to a previously uncontrolled substance added to Schedule III shall, with respect to that substance:

    (i)  require licences for manufacture, trade and distribution in accordance with article 8;

    (ii)  require medical prescriptions for supply or dispensing in accordance with article 9;

    (iii)  comply with the obligations relating to export provided in article 12, except in respect to another Party having given such notice for the substance in question;

    (iv)  comply with the obligations of article 13 in regard to prohibition of and restrictions on export and import;  and

    (v)  adopt measures in accordance with article 22 for the repression of acts contrary to laws or regulations adopted pursuant to the foregoing obligations.

(d)  A Party having given such notice with regard to a previously uncontrolled substance added to Schedule IV shall, with respect to that substance:

    (i)  require licences for manufacture, trade and distribution in accordance with article 8;

    (ii)  comply with the obligations of article 13 in regard to prohibition of and restrictions on export and import;  and

    (iii)  adopt measures in accordance with article 22 for the repression of acts contrary to laws or regulations adopted pursuant to the foregoing obligations.

(e)  A Party having given such notice with regard to a substance transferred to a Schedule providing stricter controls and obligations shall apply as a minimum all of the provisions of this Convention applicable to the Schedule from which it was transferred.

8.  (a)  The decisions of the Commission taken under this article shall be subject to review by the Council upon the request of any Party filed within 180 days from receipt of notification of the decision.  The request for review shall be sent to the Secretary-General together with all relevant information upon which the request for review is based.

(b)  The Secretary-General shall transmit copies of the request for review and the relevant information to the Commission, to the World Health Organization and to all the Parties, inviting them to submit comments within ninety days.  All comments received shall be submitted to the Council for consideration.

(c)  The Council may confirm, alter or reverse the decision of the Commission. Notification of the Council's decision shall be transmitted to all States Members of the United Nations, to non-member States Parties to this Convention, to the Commission, to the World Health Organization and to the Board.

(d)  During pendency of the review, the original decision of the Commission shall, subject to paragraph 7, remain in effect.

9.  The Parties shall use their best endeavours to apply to substances which do not fall under this Convention, but which may be used in the illicit manufacture of psychotropic substances, such measures of supervision as may be practicable.

ARTICLE 3

Special provisions regarding the control of preparations

1.   Except as provided in the following paragraphs of this article, a preparation
is subject to the same measures of control as the psychotropic substance which it
contains, and, if it contains more than one such substance, to the measures applicable
to the most strictly controlled of those substances.

2.   If a preparation containing a psychotropic substance other than a substance in
Schedule I is compounded in such a way that it presents no, or a negligible, risk of
abuse and the substance cannot be recovered by readily applicable means in a quantity
liable to abuse, so that the preparation does not give rise to a public health and
social problem, the preparation may be exempted from certain of the measures of control
provided in this Convention in accordance with paragraph 3.

3.   If a Party makes a finding under the preceding paragraph regarding a preparation,
it may decide to exempt the preparation, in its country or in one of its regions,
from any or all of the measures of control provided in this Convention except the
requirements of:

    (a)   article 8 (licences), as it applies to manufacture;

    (b)   article 11 (records), as it applies to exempt preparations;

    (c)   article 13 (prohibition of and restrictions on export and import);

    (d)   article 15 (inspection), as it applies to manufacture;

    (e)   article 16 (reports to be furnished by the Parties), as it applies
        to exempt preparations;   and

    (f)   article 22 (penal provisions), to the extent necessary for the
        repression of acts contrary to laws or regulations adopted pursuant
        to the foregoing obligations.

A Party shall notify the Secretary-General of any such decision, of the name and
composition of the exempt preparation, and of the measures of control from which
it is exempted.   The Secretary-General shall transmit the notification to the other
Parties, to the World Health Organization and to the Board.

4.   If a Party or the World Health Organization has information regarding a preparation
exempted pursuant to paragraph 3 which in its opinion may require the termination, in
whole or in part, of the exemption, it shall notify the Secretary-General and furnish
him with the information in support of the notification.   The Secretary-General shall
transmit such notification, and any information which he considers relevant, to the

Parties, to the Commission and, when the notification is made by a Party, to the World Health Organization. The World Health Organization shall communicate to the Commission an assessment of the preparation in relation to the matters specified in paragraph 2, together with a recommendation of the control measures, if any, from which the preparation should cease to be exempted. The Commission, taking into account the communication from the World Health Organization, whose assessment shall be determinative as to medical and scientific matters, and bearing in mind the economic, social, legal, administrative and other factors it may consider relevant, may decide to terminate the exemption of the preparation from any or all control measures. Any decision of the Commission taken pursuant to this paragraph shall be communicated by the Secretary-General to all States Members of the United Nations, to non-member States Parties to this Convention, to the World Health Organization and to the Board. All Parties shall take measures to terminate the exemption from the control measure or measures in question within 180 days of the date of the Secretary-General's communication.

ARTICLE 4

Other special provisions regarding the scope of control

In respect of psychotropic substances other than those in Schedule I, the Parties may permit:

(a) the carrying by international travellers of small quantities of preparations for personal use; each Party shall be entitled, however, to satisfy itself that these preparations have been lawfully obtained;

(b) the use of such substances in industry for the manufacture of non-psychotropic substances or products, subject to the application of the measures of control required by this Convention until the psychotropic substances come to be in such a condition that they will not in practice be abused or recovered;

(c) the use of such substances, subject to the application of the measures of control required by this Convention, for the capture of animals by persons specifically authorized by the competent authorities to use such substances for that purpose.



ARTICLE 5

Limitation of use to medical and scientific purposes

1.   Each Party shall limit the use of substances in Schedule I as provided in
article 7.

2.   Each Party shall, except as provided in article 4, limit by such measures as it
considers appropriate the manufacture, export, import, distribution and stocks of,
trade in, and use and possession of, substances in Schedules II, III and IV to
medical and scientific purposes.

3.   It is desirable that the Parties do not permit the possession of substances in
Schedules II, III and IV except under legal authority.

ARTICLE 6

Special administration

It is desirable that for the purpose of applying the provisions of this
Convention, each Party establish and maintain a special administration, which may
with advantage be the same as, or work in close co-operation with, the special
administration established pursuant to the provisions of conventions for the control
of narcotic drugs.

ARTICLE 7

Special provisions regarding substances in Schedule I

In respect of substances in Schedule I, the Parties shall:

(a)   prohibit all use except for scientific and very limited medical
      purposes by duly authorized persons, in medical or scientific
      establishments which are directly under the control of their
      Governments or specifically approved by them;

(b)   require that manufacture, trade, distribution and possession be
      under a special licence or prior authorization;

(c)   provide for close supervision of the activities and acts
      mentioned in paragraphs (a) and (b);

(d)   restrict the amount supplied to a duly authorized person to
      the quantity required for his authorized purpose;

(e)   require that persons performing medical or scientific functions
      keep records concerning the acquisition of the substances and
      the details of their use, such records to be preserved for at
      least two years after the last use recorded therein;   and

    (f) prohibit export and import except when both the exporter and importer are the competent authorities or agencies of the exporting and importing country or region, respectively, or other persons or enterprises which are specifically authorized by the competent authorities of their country or region for the purpose. The requirements of paragraph 1 of article 12 for export and import authorizations for substances in Schedule II shall also apply to substances in Schedule I.

ARTICLE 8

Licences

1. The Parties shall require that the manufacture of, trade (including export and import trade) in, and distribution of substances listed in Schedules II, III and IV be under licence or other similar control measure.

2. The Parties shall:

(a) control all duly authorized persons and enterprises carrying on or engaged in the manufacture of, trade (including export and import trade) in, or distribution of substances referred to in paragraph 1;

(b) control under licence or other similar control measure the establishments and premises in which such manufacture, trade or distribution may take place; and

(c) provide that security measures be taken with regard to such establishments and premises in order to prevent theft or other diversion of stocks.

3. The provisions of paragraphs 1 and 2 of this article relating to licensing or other similar control measures need not apply to persons duly authorized to perform and while performing therapeutic or scientific functions.

4. The Parties shall require that all persons who obtain licences in accordance with this Convention or who are otherwise authorized pursuant to paragraph 1 of this article or sub-paragraph (b) of article 7 shall be adequately qualified for the effective and faithful execution of the provisions of such laws and regulations as are enacted in pursuance of this Convention.

ARTICLE 9

Prescriptions

1. The Parties shall require that substances in Schedules II, III and IV be supplied or dispensed for use by individuals pursuant to medical prescription only, except when individuals may lawfully obtain, use, dispense or administer such substances in the duly authorized exercise of therapeutic or scientific functions.

2. The Parties shall take measures to ensure that prescriptions for substances in Schedules II, III and IV are issued in accordance with sound medical practice and subject to such regulation, particularly as to the number of times they may be refilled and the duration of their validity, as will protect the public health and welfare.

3. Notwithstanding paragraph 1, a Party may, if in its opinion local circumstances so require and under such conditions, including record-keeping, as it may prescribe, authorize licensed pharmacists or other licensed retail distributors designated by the authorities responsible for public health in its country or part thereof to supply, at their discretion and without prescription, for use for medical purposes by individuals in exceptional cases, small quantities, within limits to be defined by the Parties, of substances in Schedules III and IV.

ARTICLE 10

Warnings on packages, and advertising

1. Each Party shall require, taking into account any relevant regulations or recommendations of the World Health Organization, such directions for use, including cautions and warnings, to be indicated on the labels where practicable and in any case on the accompanying leaflet of retail packages of psychotropic substances, as in its opinion are necessary for the safety of the user.

2. Each Party shall, with due regard to its constitutional provisions, prohibit the advertisement of such substances to the general public.

ARTICLE 11

Records

1. The Parties shall require that, in respect of substances in Schedule I, manufacturers and all other persons authorized under article 7 to trade in and distribute those substances keep records, as may be determined by each Party, showing details of the quantities manufactured, the quantities held in stock, and, for each acquisition and disposal, details of the quantity, date, supplier and recipient.

2. The Parties shall require that, in respect of substances in Schedules II and III, manufacturers, wholesale distributors, exporters and importers keep records, as may be determined by each Party, showing details of the quantities manufactured and, for each acquisition and disposal, details of the quantity, date, supplier and recipient.

3. The Parties shall require that, in respect of substances in Schedule II, retail distributors, institutions for hospitalization and care and scientific institutions keep records, as may be determined by each Party, showing, for each acquisition and disposal, details of the quantity, date, supplier and recipient.

4. The Parties shall ensure, through appropriate methods and taking into account the professional and trade practices in their countries, that information regarding acquisition and disposal of substances in Schedule III by retail distributors, institutions for hospitalization and care and scientific institutions is readily available.

5. The Parties shall require that, in respect of substances in Schedule IV, manufacturers, exporters and importers keep records, as may be determined by each Party, showing the quantities manufactured, exported and imported.

6. The Parties shall require manufacturers of preparations exempted under paragraph 3 of article 3 to keep records as to the quantity of each psychotropic substance used in the manufacture of an exempt preparation, and as to the nature, total quantity and initial disposal of the exempt preparation manufactured therefrom.

7. The Parties shall ensure that the records and information referred to in this article which are required for purposes of reports under article 16 shall be preserved for at least two years.

ARTICLE 12

Provisions relating to international trade

1. (a) Every Party permitting the export or import of substances in Schedule I or II shall require a separate import or export authorization, on a form to be established by the Commission, to be obtained for each such export or import whether it consists of one or more substances.

(b) Such authorization shall state the international non-proprietary name, or, lacking such a name, the designation of the substance in the Schedule, the quantity to be exported or imported, the pharmaceutical form, the name and address of the exporter and importer, and the period within which the export or import must be effected. If the substance is exported or imported in the form of a preparation, the name of the preparation, if any, shall additionally be furnished. The export authorization shall also state the number and date of the import authorization and the authority by whom it has been issued.



(c)  Before issuing an export authorization the Parties shall require an import authorization, issued by the competent authority of the importing country or region and certifying that the importation of the substance or substances referred to therein is approved, and such an authorization shall be produced by the person or establishment applying for the export authorization.

(d)  A copy of the export authorization shall accompany each consignment, and the Government issuing the export authorization shall send a copy to the Government of the importing country or region.

(e)  The Government of the importing country or region, when the importation has been effected, shall return the export authorization with an endorsement certifying the amount actually imported, to the Government of the exporting country or region.

2.    (a)  The Parties shall require that for each export of substances in Schedule III exporters shall draw up a declaration in triplicate, on a form to be established by the Commission, containing the following information:

(i)  the name and address of the exporter and importer;

(ii)  the international non-proprietary name, or, failing such a name, the designation of the substance in the Schedule;

(iii)  the quantity and pharmaceutical form in which the substance is exported, and, if in the form of a preparation, the name of the preparation, if any; and

(iv)  the date of despatch.

(b)  Exporters shall furnish the competent authorities of their country or region with two copies of the declaration.   They shall attach the third copy to their consignment.

(c)  A Party from whose territory a substance in Schedule III has been exported shall, as soon as possible but not later than ninety days after the date of despatch, send to the competent authorities of the importing country or region, by registered mail with return of receipt requested, one copy of the declaration received from the exporter.

(d)  The Parties may require that, on receipt of the consignment, the importer shall transmit the copy accompanying the consignment, duly endorsed stating the quantities received and the date of receipt, to the competent authorities of his country or region.



3.   In respect of substances in Schedules I and II the following additional provisions shall apply:

(a)  The Parties shall exercise in free ports and zones the same supervision and control as in other parts of their territory, provided, however, that they may apply more drastic measures.

(b)  Exports of consignments to a post office box, or to a bank to the account of a person other than the person named in the export authorization, shall be prohibited.

(c)  Exports to bonded warehouses of consignments of substances in Schedule I are prohibited.  Exports of consignments of substances in Schedule II to a bonded warehouse are prohibited unless the Government of the importing country certifies on the import authorization, produced by the person or establishment applying for the export authorization, that it has approved the importation for the purpose of being placed in a bonded warehouse.  In such case the export authorization shall certify that the consignment is exported for such purpose.  Each withdrawal from the bonded warehouse shall require a permit from the authorities having jurisdiction over the warehouse and, in the case of a foreign destination, shall be treated as if it were a new export within the meaning of this Convention.

(d)  Consignments entering or leaving the territory of a Party not accompanied by an export authorization shall be detained by the competent authorities.

(e)  A Party shall not permit any substances consigned to another country to pass through its territory, whether or not the consignment is removed from the conveyance in which it is carried, unless a copy of the export authorization for consignment is produced to the competent authorities of such Party.

(f)  The competent authorities of any country or region through which a consignment of substances is permitted to pass shall take all due measures to prevent the diversion of the consignment to a destination other than that named in the accompanying copy of the export authorization, unless the Government of the country or region through which the consignment is passing authorizes the diversion.  The Government of the country or region of transit shall treat any requested diversion as if the diversion were an export from the country or region of transit to the country or region of new destination.  If the diversion is authorized, the provisions of paragraph 1 (e) shall also apply between the country or region of transit and the country or region which originally exported the consignment.

(g)  No consignment of substances, while in transit or whilst being stored in a bonded warehouse, may be subjected to any process which would change the nature of the substance in question.  The packing may not be altered without the permission of the competent authorities.



(h)  The provisions of sub-paragraphs (e) to (g) relating to the passage of substances through the territory of a Party do not apply where the consignment in question is transported by aircraft which does not land in the country or region of transit.  If the aircraft lands in any such country or region, those provisions shall be applied so far as circumstances require.

(i)  The provisions of this paragraph are without prejudice to the provisions of any international agreements which limit the control which may be exercised by any of the Parties over such substances in transit.

ARTICLE 13

Prohibition of and restrictions on export and import

1.   A Party may notify all the other Parties through the Secretary-General that it prohibits the import into its country or into one of its regions of one or more substances in Schedule II, III or IV, specified in its notification.  Any such notification shall specify the name of the substance as designated in Schedule II, III or IV.

2.   If a Party has been notified of a prohibition pursuant to paragraph 1, it shall take measures to ensure that none of the substances specified in the notification is exported to the country or one of the regions of the notifying Party.

3.   Notwithstanding the provisions of the preceding paragraphs, a Party which has given notification pursuant to paragraph 1 may authorize by special import licence in each case the import of specified quantities of the substances in question or preparations containing such substances.  The issuing authority of the importing country shall send two copies of the special import licence, indicating the name and address of the importer and the exporter, to the competent authority of the exporting country or region, which may then authorize the exporter to make the shipment.  One copy of the special import licence, duly endorsed by the competent authority of the exporting country or region, shall accompany the shipment.



ARTICLE 14

Special provisions concerning the carriage of psychotropic substances in first-aid kits of ships, aircraft or other forms of public transport engaged in international traffic

1. The international carriage by ships, aircraft or other forms of international public transport, such as international railway trains and motor coaches, of such limited quantities of substances in Schedule II, III or IV as may be needed during their journey or voyage for first-aid purposes or emergency cases shall not be considered to be export, import or passage through a country within the meaning of this Convention.

2. Appropriate safeguards shall be taken by the country of registry to prevent the improper use of the substances referred to in paragraph 1 or their diversion for illicit purposes. The Commission, in consultation with the appropriate international organizations, shall recommend such safeguards.

3. Substances carried by ships, aircraft or other forms of international public transport, such as international railway trains and motor coaches, in accordance with paragraph 1 shall be subject to the laws, regulations, permits and licences of the country of registry, without prejudice to any rights of the competent local authorities to carry out checks, inspections and other control measures on board these conveyances. The administration of such substances in the case of emergency shall not be considered a violation of the requirements of paragraph 1 of article 9.

ARTICLE 15

Inspection

The Parties shall maintain a system of inspection of manufacturers, exporters, importers, and wholesale and retail distributors of psychotropic substances and of medical and scientific institutions which use such substances. They shall provide for inspections, which shall be made as frequently as they consider necessary, of the premises and of stocks and records.



ARTICLE 16

Reports to be furnished by the Parties

1.  The Parties shall furnish to the Secretary-General such information as the Commission may request as being necessary for the performance of its functions, and in particular an annual report regarding the working of the Convention in their territories including information on:

    (a)  important changes in their laws and regulations concerning psychotropic substances;  and

    (b)  significant developments in the abuse of and the illicit traffic in psychotropic substances within their territories.

2.  The Parties shall also notify the Secretary-General of the names and addresses of the governmental authorities referred to in sub-paragraph (f) of article 7, in article 12 and in paragraph 3 of article 13.  Such information shall be made available to all Parties by the Secretary-General.

3.  The Parties shall furnish, as soon as possible after the event, a report to the Secretary-General in respect of any case of illicit traffic in psychotropic substances or seizure from such illicit traffic which they consider important because of:

    (a)  new trends disclosed;

    (b)  the quantities involved;

    (c)  the light thrown on the sources from which the substances are obtained;  or

    (d)  the methods employed by illicit traffickers.

Copies of the report shall be communicated in accordance with sub-paragraph (b) of article 21.

4.  The Parties shall furnish to the Board annual statistical reports in accordance with forms prepared by the Board:

    (a)  in regard to each substance in Schedules I and II, on quantities manufactured, exported to and imported from each country or region as well as on stocks held by manufacturers;

    (b)  in regard to each substance in Schedules III and IV, on quantities manufactured, as well as on total quantities exported and imported;

    (c)  in regard to each substance in Schedules II and III, on quantities used in the manufacture of exempt preparations;  and

    (d)  in regard to each substance other than a substance in Schedule I, on quantities used for industrial purposes in accordance with sub-paragraph (b) of article 4.

The quantities manufactured which are referred to in sub-paragraphs (a) and (b) of this paragraph do not include the quantities of preparations manufactured.



5. A Party shall furnish the Board, on its request, with supplementary statistical information relating to future periods on the quantities of any individual substance in Schedules III and IV exported to and imported from each country or region. That Party may request that the Board treat as confidential both its request for information and the information given under this paragraph.

6. The Parties shall furnish the information referred to in paragraphs 1 and 4 in such a manner and by such dates as the Commission or the Board may request.

ARTICLE 17

Functions of the Commission

1. The Commission may consider all matters pertaining to the aims of this Convention and to the implementation of its provisions, and may make recommendations relating thereto.

2. The decisions of the Commission provided for in articles 2 and 3 shall be taken by a two-thirds majority of the members of the Commission.

ARTICLE 18

Reports of the Board

1. The Board shall prepare annual reports on its work containing an analysis of the statistical information at its disposal, and, in appropriate cases, an account of the explanations, if any, given by or required of Governments, together with any observations and recommendations which the Board desires to make. The Board may make such additional reports as it considers necessary. The reports shall be submitted to the Council through the Commission, which may make such comments as it sees fit.

2. The reports of the Board shall be communicated to the Parties and subsequently published by the Secretary-General. The Parties shall permit their unrestricted distribution.



ARTICLE 19

Measures by the Board to ensure the
execution of the provisions of the Convention

1.    (a)  If, on the basis of its examination of information submitted by governments
to the Board or of information communicated by United Nations organs, the Board has
reason to believe that the aims of this Convention are being seriously endangered by
reason of the failure of a country or region to carry out the provisions of this
Convention, the Board shall have the right to ask for explanations from the Government
of the country or region in question.  Subject to the right of the Board to call the
attention of the Parties, the Council and the Commission to the matter referred to in
sub-paragraph (c) below, it shall treat as confidential a request for information or
an explanation by a government under this sub-paragraph.

(b)  After taking action under sub-paragraph (a), the Board, if satisfied that
it is necessary to do so, may call upon the Government concerned to adopt such
remedial measures as shall seem under the circumstances to be necessary for the
execution of the provisions of this Convention.

(c)  If the Board finds that the Government concerned has failed to give
satisfactory explanations when called upon to do so under sub-paragraph (a), or has
failed to adopt any remedial measures which it has been called upon to take under
sub-paragraph (b), it may call the attention of the Parties, the Council and the
Commission to the matter.

2.   The Board, when calling the attention of the Parties, the Council and the
Commission to a matter in accordance with paragraph 1(c), may, if it is satisfied
that such a course is necessary, recommend to the Parties that they stop the export,
import, or both, of particular psychotropic substances, from or to the country or
region concerned, either for a designated period or until the Board shall be satisfied
as to the situation in that country or region.  The State concerned may bring the
matter before the Council.

3.   The Board shall have the right to publish a report on any matter dealt with under
the provisions of this article, and communicate it to the Council, which shall forward
it to all Parties.  If the Board publishes in this report a decision taken under this
article or any information relating thereto, it shall also publish therein the views
of the Government concerned if the latter so requests.

4.   If in any case a decision of the Board which is published under this article is
not unanimous, the views of the minority shall be stated.



5. Any State shall be invited to be represented at a meeting of the Board at which a question directly interesting it is considered under this article.

6. Decisions of the Board under this article shall be taken by a two-thirds majority of the whole number of the Board.

7. The provisions of the above paragraphs shall also apply if the Board has reason to believe that the aims of this Convention are being seriously endangered as a result of a decision taken by a Party under paragraph 7 of article 2.

ARTICLE 20

Measures against the abuse of psychotropic substances

1. The Parties shall take all practicable measures for the prevention of abuse of psychotropic substances and for the early identification, treatment, education, after-care, rehabilitation and social reintegration of the persons involved, and shall co-ordinate their efforts to these ends.

2. The Parties shall as far as possible promote the training of personnel in the treatment, after-care, rehabilitation and social reintegration of abusers of psychotropic substances.

3. The Parties shall assist persons whose work so requires to gain an understanding of the problems of abuse of psychotropic substances and of its prevention, and shall also promote such understanding among the general public if there is a risk that abuse of such substances will become widespread.

ARTICLE 21

Action against the illicit traffic

Having due regard to their constitutional, legal and administrative systems, the Parties shall:

(a) make arrangements at the national level for the co-ordination of preventive and repressive action against the illicit traffic; to this end they may usefully designate an appropriate agency responsible for such co-ordination;

(b) assist each other in the campaign against the illicit traffic in psychotropic substances, and in particular immediately transmit, through the diplomatic channel or the competent authorities designated by the Parties for this purpose, to the other Parties directly concerned, a copy of any report addressed to the Secretary-General under article 16 in connexion with the discovery of a case of illicit traffic or a seizure;



(c) co-operate closely with each other and with the competent international organizations of which they are members with a view to maintaining a co-ordinated campaign against the illicit traffic;

(d) ensure that international co-operation between the appropriate agencies be conducted in an expeditious manner; and

(e) ensure that, where legal papers are transmitted internationally for the purpose of judicial proceedings, the transmittal be effected in an expeditious manner to the bodies designated by the Parties; this requirement shall be without prejudice to the right of a Party to require that legal papers be sent to it through the diplomatic channel.

ARTICLE 22

Penal provisions

1. (a) Subject to its constitutional limitations, each Party shall treat as a punishable offence, when committed intentionally, any action contrary to a law or regulation adopted in pursuance of its obligations under this Convention, and shall encure that serious offences shall be liable to adequate punishment, particularly by imprisonment or other penalty of deprivation of liberty.

(b) Notwithstanding the preceding sub-paragraph, when abusers of psychotropic substances have committed such offences, the Parties may provide, either as an alternative to conviction or punishment or in addition to punishment, that such abusers undergo measures of treatment, education, after-care, rehabilitation and social reintegration in conformity with paragraph 1 of article 20.

2. Subject to the constitutional limitations of a Party, its legal system and domestic law,

(a) (i) if a series of related actions constituting offences under paragraph 1 has been committed in different countries, each of them shall be treated as a distinct offence;

(ii) intentional participation in, conspiracy to commit and attempts to commit, any of such offences, and preparatory acts and financial operations in connexion with the offences referred to in this article, shall be punishable offences as provided in paragraph 1;

(iii) foreign convictions for such offences shall be taken into account for the purpose of establishing recidivism; and

(iv) serious offences heretofore referred to committed either by
nationals or by foreigners shall be prosecuted by the Party
in whose territory the offence was committed, or by the
Party in whose territory the offender is found if extradition
is not acceptable in conformity with the law of the Party to
which application is made, and if such offender has not
already been prosecuted and judgement given.

(b) It is desirable that the offences referred to in paragraph 1 and
paragraph 2 (a) (ii) be included as extradition crimes in any extradition treaty which
has been or may hereafter be concluded between any of the Parties, and, as between any
of the Parties which do not make extradition conditional on the existence of a treaty
or on reciprocity, be recognized as extradition crimes; provided that extradition
shall be granted in conformity with the law of the Party to which application is made,
and that the Party shall have the right to refuse to effect the arrest or grant the
extradition in cases where the competent authorities consider that the offence is not
sufficiently serious.

3.    Any psychotropic substance or other substance, as well as any equipment, used
in or intended for the commission of any of the offences referred to in paragraphs 1
and 2 shall be liable to seizure and confiscation.

4.    The provisions of this article shall be subject to the provisions of the domestic
law of the Party concerned on questions of jurisdiction.

5.    Nothing contained in this article shall affect the principle that the offences to
which it refers shall be defined, prosecuted and punished in conformity with the
domestic law of a Party.

ARTICLE 23

Application of stricter control measures than those
required by this Convention

A Party may adopt more strict or severe measures of control than those provided
by this Convention if, in its opinion, such measures are desirable or necessary for
the protection of the public health and welfare.

ARTICLE 24

Expenses of international organs incurred in administering the provisions of the Convention

The expenses of the Commission and the Board in carrying out their respective functions under this Convention shall be borne by the United Nations in such manner as shall be decided by the General Assembly. The Parties which are not Members of the United Nations shall contribute to these expenses such amounts as the General Assembly finds equitable and assesses from time to time after consultation with the Governments of these Parties.

ARTICLE 25

Procedure for admission, signature, ratification and accession

1. Members of the United Nations, States not Members of the United Nations which are members of a specialized agency of the United Nations or of the International Atomic Energy Agency or Parties to the Statute of the International Court of Justice,[1] and any other State invited by the Council, may become Parties to this Convention:

(a) by signing it; or

(b) by ratifying it after signing it subject to ratification; or

(c) by acceding to it.

2. The Convention shall be open for signature until 1 January 1972 inclusive. Thereafter it shall be open for accession.

3. Instruments of ratification or accession shall be deposited with the Secretary-General.

ARTICLE 26

Entry into force

1. The Convention shall come into force on the ninetieth day after forty of the States referred to in paragraph 1 of article 25 have signed it without reservation of ratification or have deposited their instruments of ratification or accession.

2. For any other State signing without reservation of ratification, or depositing an instrument of ratification or accession after the last signature or deposit referred to in the preceding paragraph, the Convention shall enter into force on the ninetieth day following the date of its signature or deposit of its instrument of ratification or accession.

[1] TS 993; 59 Stat. 1055. [Footnote added by the Department of State.]

ARTICLE 27

Territorial application

The Convention shall apply to all non-metropolitan territories for the international relations of which any Party is responsible except where the previous consent of such a territory is required by the Constitution of the Party or of the territory concerned, or required by custom. In such a case the Party shall endeavour to secure the needed consent of the territory within the shortest period possible, and when the consent is obtained the Party shall notify the Secretary-General. The Convention shall apply to the territory or territories named in such a notification from the date of its receipt by the Secretary-General. In those cases where the previous consent of the non-metropolitan territory is not required, the Party concerned shall, at the time of signature, ratification or accession, declare the non-metropolitan territory or territories to which this Convention applies.

ARTICLE 28

Regions for the purposes of this Convention

1. Any Party may notify the Secretary-General that, for the purposes of this Convention, its territory is divided into two or more regions, or that two or more of its regions are consolidated into a single region.

2. Two or more Parties may notify the Secretary-General that, as the result of the establishment of a customs union between them, those Parties constitute a region for the purposes of this Convention.

3. Any notification under paragraph 1 or 2 shall take effect on 1 January of the year following the year in which the notification was made.

ARTICLE 29

Denunciation

1. After the expiry of two years from the date of the coming into force of this Convention any Party may, on its own behalf or on behalf of a territory for which it has international responsibility, and which has withdrawn its consent given in accordance with article 27, denounce this Convention by an instrument in writing deposited with the Secretary-General.

2. The denunciation, if received by the Secretary-General on or before the first day of July of any year, shall take effect on the first day of January of the succeeding year, and if received after the first day of July it shall take effect as if it had been received on or before the first day of July in the succeeding year.

3. The Convention shall be terminated if, as a result of denunciations made in accordance with paragraphs 1 and 2, the conditions for its coming into force as laid down in paragraph 1 of article 26 cease to exist.



ARTICLE 30

Amendments

1. Any Party may propose an amendment to this Convention. The text of any such amendment and the reasons therefor shall be communicated to the Secretary-General, who shall communicate them to the Parties and to the Council. The Council may decide either:

(a) that a conference shall be called in accordance with paragraph 4 of Article 62 of the Charter of the United Nations [1] to consider the proposed amendment; or

(b) that the Parties shall be asked whether they accept the proposed amendment and also asked to submit to the Council any comments on the proposal.

2. If a proposed amendment circulated under paragraph 1 (b) has not been rejected by any Party within eighteen months after it has been circulated, it shall thereupon enter into force. If however a proposed amendment is rejected by any Party, the Council may decide, in the light of comments received from Parties, whether a conference shall be called to consider such amendment.

ARTICLE 31

Disputes

1. If there should arise between two or more Parties a dispute relating to the interpretation or application of this Convention, the said Parties shall consult together with a view to the settlement of the dispute by negotiation, investigation, mediation, conciliation, arbitration, recourse to regional bodies, judicial process or other peaceful means of their own choice.

2. Any such dispute which cannot be settled in the manner prescribed shall be referred, at the request of any one of the parties to the dispute, to the International Court of Justice for decision.

[1] TS 993; 59 Stat. 1047. [Footnote added by the Department of State.]

ARTICLE 32

Reservations

1. No reservation other than those made in accordance with paragraphs 2, 3 and 4 of the present article shall be permitted.

2. Any State may at the time of signature, ratification or accession make reservations in respect of the following provisions of the present Convention:

(a) article 19, paragraphs 1 and 2;

(b) article 27; and

(c) article 31.

3. A State which desires to become a Party but wishes to be authorized to make reservations other than those made in accordance with paragraphs 2 and 4 may inform the Secretary-General of such intention. Unless by the end of twelve months after the date of the Secretary-General's communication of the reservation concerned, this reservation has been objected to by one third of the States that have signed without reservation of ratification, ratified or acceded to this Convention before the end of that period, it shall be deemed to be permitted, it being understood however that States which have objected to the reservation need not assume towards the reserving State any legal obligation under this Convention which is affected by the reservation.

4. A State on whose territory there are plants growing wild which contain psychotropic substances from among those in Schedule I and which are traditionally used by certain small, clearly determined groups in magical or religious rites, may, at the time of signature, ratification or accession, make reservations concerning these plants, in respect of the provisions of article 7, except for the provisions relating to international trade.

5. A State which has made reservations may at any time by notification in writing to the Secretary-General withdraw all or part of its reservations.



ARTICLE 33

Notifications

The Secretary-General shall notify to all the States referred to in paragraph 1 of article 25:

(a)  signatures, ratifications and accessions in accordance with article 25;

(b)  the date upon which this Convention enters into force in accordance with article 26;

(c)  denunciations in accordance with article 29;  and

(d)  declarations and notifications under articles 27, 28, 30 and 32.

IN WITNESS WHEREOF, the undersigned, duly authorized, have signed this Convention on behalf of their respective Governments.

DONE AT VIENNA, this twenty-first day of February one thousand nine hundred and seventy-one, in a single copy in the Chinese, English, French, Russian and Spanish languages, each being equally authentic.  The Convention shall be deposited with the Secretary-General of the United Nations, who shall transmit certified true copies thereof to all the Members of the United Nations and to the other States referred to in paragraph 1 of article 25.